224 F.2d 811
 UNITED STATES of America, Appellant,
v.
COMPANIA CUBANA DE AVIACION, S.A., Appellee.
UNITED STATES of America, Appellant & Cross-Appellee,
v.
Mercedes Gutierrez Vda de Fernandez PACHECO, Appellee &
Cross-Appellant.
Mercedes Gutierrez Vda de Fernandez PACHECO, Appellee &
Cross-Appellant,
v.
UNITED STATES of America, Appellant & Cross-Appellee.
UNITED STATES of America, Appellant & Cross-Appellee,
v.
Gladys de Miranda Vda de SALAS, Appellee & Cross-Appellant.
Gladys de Miranda Vda de SALAS, Appellee & Cross-Appellant,
v.
UNITED STATES of America, Appellant & Cross-Appellee.
UNITED STATES of America, Appellant,
v.
Maria Matilde Ramirez Salas Vda de BAZAN, Appellee.
 Nos. 15383, 15390, 15391, 15396.
 United States Court of Appeals Fifth Circuit.
 June 30, 1955.
Rehearing Denied Aug. 18, 1955.
 
 James L. Guilmartin, U.S. Atty., Miami, Fla., Geo. S. Leonard, Atty., Dept. of Justice, Washington, D.C. (Warren E. Burger, Asst. Atty. Gen., Paul A. Sweeney, Herman Marcuse, Attys., Dept. of Justice, Washington, D.C., on the brief), for appellant.
 James Halley Ruby, Miami Beach, Fla., on the brief, for Mildred Lucille Holmes de Valencia, cross-appellant.
 David W. Dyer, Douglas D. Batchelor, Miami, Fla., David L. Corbin, Matthew J. Corrigan, New York City (Smathers, Thompson, Maxwell & Dyer, Miami, Fla., Haight, Gardner, Poor & Havens, Mendes & Mount, New York City, on the brief), for appellees.
 George J. Baya, Miami, Fla., on the brief for appellees, Milwaukee Mechanics Insurance Company, a corporation and Fidelity & Guaranty Insurance Company, a New York corporation.
 J. Martin Wordes, Miami, Fla., Weisman, Allan, Spett & Sheinberg, New York City, on the brief, for appellees, Sadie Rosenberg, Lillian Blatt, Lillian Blatt, as Guardian ad litem of Sheila Blatt, and Lilliam Blatt, Administratrix of the Estate of Ida Rosenberg, Deceased.
 Before HUTCHESON, Chief Judge, and RIVES and TUTTLE, Circuit Judges.
 HUTCHESON, Chief Judge.
 
 
 1
 These are appeals by the United States from adverse judgments entered on April 19, 1954, in favor of the several plaintiffs-appellees, and dismissing the counterclaim filed by the United States against the plaintiff, Compania Cubana de Aviacion, S.A., (hereafter referred to as Cubana) in the above styled and numbered causes.
 
 
 2
 The litigation arises from the collision on April 25, 1951, off Key West, Florida, between a four-motored DC-4 passenger plane owned and operated by Cubana, and a two-motored Beachcraft SNB training plane (hereinafter referred to as SNB), owned and operated by the United States Navy.
 
 
 3
 The DC-4 was on a flight from Miami, Florida, to Havana, Cuba. The court's finding 8 was as follows:
 
 
 4
 'Prior to the departure from Miami on April 25, 1951, of Flight No. 493, a flight plan was filed by Cubana with Miami Air Route Traffic Control. At 11:14 A.M. Miami Air Route Traffic Control issued the following clearance for Flight No. 493:
 
 
 5
 "ATC clears CCA 493 cruise and maintain 4000.'
 
 
 6
 'This was an instrument flight clearance and was communicated to Flight No. 493. At 11:19 A.M. Flight No. 493 advised Pan American Airways' Radio in Miami that it was leaving 2000 feet and climbing to 4000 feet. No further radio contact was had with this flight.'
 
 
 7
 Its route called for a course of 223 degrees from Miami to Key West, and somewhere in that general vicinity it had to make a turn south-southwest in order to proceed to Havana at 197 degrees, along, or parallel to, the southern leg of the Key West radio range. The SNB was engaged in a training flight under simulated instrument flying conditions. A combination of blue goggles and amber plexiglass panels in the window of the cockpit, if being used at the time, would prevent the officer in the pilot's seat from looking out of the plane, although he could see the instrument panel.[1]
 
 
 8
 As a result of the collision, both planes plunged into the ocean. The DC-4 carried five crew members and thirty-four passengers. The SNB had a crew of four. There were no survivors. Some forty-five actions for wrongful death and property damage were brought against the United States, Cubana, and other air lines. An Order of Consolidation dated June 1, 1953, divided these actions into three groups. Group A, the one involved in these appeals, consists of those actions in which the United States is the sole defendant, viz., an action brought by Cubana against the United States, twelve actions for the wrongful death of the crew and of some of the passengers, and two subrogation claims by insurance companies for property losses. Group B covers nineteen actions in which one or more of the defendants pleaded the Warsaw Convention Concerning International Air Transportation. Group C consists of ten actions in which the United States is not the sole defendant and in which the said Warsaw Convention was not pleaded. It includes the actions against Cubana for the wrongful deaths of the SNB crew.
 
 
 9
 The complaints charge that the collision of the two planes was caused by the negligence of the SNB crew. The answer of the United States denies the charge of negligence; its cross-complaint against Cubana alleges that the accident was caused solely by the fault of Cubana and its employees.
 
 
 10
 There was a full scale trial, which consisted, of depositions and oral testimony of persons claiming to have witnessed the collision, of testimony as to the safety record of the Cubana and its pilots, and as to the qualifications of those employed in the operation of the two planes, and of a great mass of expert opinion evidence by one Downs, a witness for the plaintiff, based upon his examination of the severed wing of the Cubana plane, together with much other testimony, opinion and otherwise. At the conclusion of it all, the district judge filed lengthy findings of fact which dealt with, first, the equipment and qualifications of the pilot, the co-pilot, and the extra members of the crew of the DC-4, as well as of the operators and occupants of the SNB, the arrangements on that plane, and the contemplated training maneuvers which those in that plane were to undertake to accomplish during the training flight in question.
 
 
 11
 These findings included the pertinent Civil Air Regulations[2] issued by the Secretary of Commerce under the authority of Civil Aeronautics Act of 1938, as amended, 49 U.S.C.A. § 401 et seq., and in effect at and prior to the time of the collision, together with a finding that at the time of the collision, the operation and flight of both aircrafts were governed by Part 60 of the Civil Air Regulations, and findings 17 to 22,[3] which are the crucial findings in the case.
 
 
 12
 Based on these findings, the court announced its conclusions of law: that each of the plaintiffs in each case should recover of the defendant the amounts set forth in the conclusion appertaining to him; that the cross action of the defendant against Cubana should be dismissed; and that the second count in No. 4129-Civil should also be dismissed and judgments drawn in accordance with these findings were entered.
 
 
 13
 Motions objecting to the findings of fact and conclusions of law and asking for amended findings of fact, and, in the alternative, for a new trial for errors by the court, and to reopen the cases for taking new testimony, were overruled, and defendant, appealing from the judgment in each case, is here urging that it be reversed and rendered, or reversed and the cause remanded for trial anew.
 
 
 14
 The plaintiffs in two of the cases, Nos. 15390 and 15391, appealing from the judgments in their favor, in so far as they are inadequate in amount, seek an increase thereof in this court.
 
 
 15
 The theory of appellees, with which the district judge agreed, was: that the DC-4 and the SNB were flying on a converging course with the DC-4 on the right of the SNB; and that the SNB either negligently failed to see the DC-4 or violated Air Traffic Rule 60.14(b), 'When aircraft are converging at approximately the same altitude, each shall give way to the other which is on his right'. Appellees also claimed: that, without having obtained adequate and accurate information as to the commercial flights in progress, the SNB was conducting dangerous maneuvers at the time of the accident, and that it was negligent and improper for it to so conduct a training flight across commercial airways at that time and place.
 
 
 16
 As the United States states its theory of the case, it is that at the time of the accident the two planes were not on converging courses but the DC-4 was overtaking the SNB. Basing this defense on the comparative speeds and courses of the two planes, it points out that the DC-4 was cruising roughly southwest at a speed of 205 miles per hour and at sometime in its progress it had to make a slight southward turn (to 197 degrees) over Key West for Havana, and that the SNB was traveling about 60 miles per hour slower along the eastern leg of the Key West radio range on a course south of west and then changed its direction by 29 degrees to a course slightly north of west when it went over the Key West radio range station, located about 1 1/2 miles east of the place of the accident. So pointing, it insists, on the basis of this argument and the supporting testimony of its eye witnesses to the collision, that it occurred because the DC-4 not only overtook the SNB from the rear but, in addition, made a left turn across the course of the latter in violation of Air Traffic Rules 60.14(d) which provide that any overtaken aircraft has the right-of-way and that the overtaking plane must keep to the right until it is entirely past and clear, i.e., until there is no longer any risk of collision. Moreover, it urges upon us: that the evidence establishes that the flight of the SNB was a standard instrument approach commonly conducted by commercial air lines under similar conditions; that Cubana was fully advised of the training activities of the Navy near Key West; and that any training maneuvers which might have been dangerous to commercial flights were conducted in warning areas far away from the air lanes.
 
 
 17
 Thus it argues that the principal and primary issue before the court, material on this appeal, was the determination as to which of the two planes had the right-of-way, and this in turn depended: first, on whether at the time when the risk of collision arose, or the necessity of taking precaution began, the two planes were on converging or overtaking courses; and, second, on whether, even if they were converging, the DC-4 made a left turn into the SNB.
 
 
 18
 So arguing, it insists: that the district judge, carried away by his preoccupation with the wholly irrelevant questions of Cubana's safety record and the comparison to the disadvantage of the SNB of the efficiency and competency of the crew of the DC-4 with that of the crew of the SNB, attached undue weight to the speculation and theorizing of Downs, the plaintiff's expert witness and the meager and unsatisfactory deposition testimony of two witnesses for plaintiff, Vintila and Witherington; and that within the meaning and effect of the rule for reviewing findings of fact, under Rule 52(a), Fed.Rules Civ.Proc. 28 U.S.C.A., laid down by this court in Sanders v. Leech, 5 Cir., 158 F.2d 486, 489, the findings are without substantial evidence to support them, the court has misapprehended the effect of the evidence, and, though there is evidence which, if credible, would be substantial, the force and effect of the testimony, considered as a whole, convinces that the finding is so against the great preponderance of the credible testimony that it does not represent the truth and right of the case. Cf. U.S. v. U.S. Gypsum Co., 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746. Indeed, appellant argues that instead of, as he was required to do, examining the evidence in the light of the heavy burden imposed upon plaintiff to make out its case, and finding for defendant on the ground either that the evidence was not sufficient to sustain plaintiff's burden of pointing out how the injury occurred and what caused it, or that the overwhelming evidence and the truth and right of the case required a finding that the fault was with the DC-4 and plaintiff could not recover, the district judge found for plaintiff on evidence wholly inadequate to sustain the findings, indeed contrary thereto.
 
 
 19
 In addition to this frontal attack upon the findings, defendant urges upon us that the procedural rulings of the court, limiting appellant's right of cross-examination, depriving it of its right to offer surrebuttal evidence and otherwise, improperly enlarged appellee's procedural rights and constituted abuse of judicial discretion.
 
 
 20
 Finally, it urges: that the $400,000 award in favor of Cubana is not supported by sufficient evidence of the market value of the DC-4 and that, while there is evidence of other losses which, if sufficient, would support a much higher finding, this evidence takes into consideration improper elements of damage and thus produces a situation under which, since the finding was general and no distinction was made in it between those portions of the claim which were proper and those which were improper, the entire finding must be reversed.
 
 
 21
 The appellees, as is natural to the litigant who has won below, see the matter much more simply than does appellant. As they present their case, in their main brief, the findings of fact made by the district court constitute a concise analysis of the facts presented in this case and they adopt them as their statement of the case. With this beginning, they put forward as presenting the sole question of merit in the case the question, 'Are the findings of the district court clearly erroneous?' Disagreeing with the appellant's attempt to state to this court appellees' position on the case, it thus states the issues joined: 'The plaintiffs' position essentially is as set forth by the district court in its findings. The DC-4 had the right of way, and the SNB was negligent in failing to observe the approach of the larger plane and in failing to give way. On the other hand, the Government's position at the trial below was essentially that the DC-4 overtook the SNB and that the SNB therefore had the right of way. The defendant recognizes that the principle issue material on this appeal is the determination as to which plane had the right of way, and we concur with this assertion.'
 
 
 22
 Thus directly joining issue with the appellant's attack upon the findings of fact as clearly erroneous, they proceed to discuss each of the findings, beginning with Finding 17, and to argue persuasively and with force that the findings of the court as to where the first point of contact between the planes was made, based upon the finding of cuts in the leading edge and under surface of the left outer wing of the DC-4 and Mr. Downs' opinion testimony that they were made by the blades of the right propeller of the SNB, are well supported in the evidence, indeed that the evidence would not reasonably support any other conclusion.
 
 
 23
 Appellees meet the government's contentions: that Downs' testimony is unreliable and erroneous; and that the cuts were not propeller made but made by cables in lifting the wing and drawing it to the surface; by pointing out that the district judge resolved all of these conflicting questions in their favor, and that his resolution of them is strongly supported not only by downs' testimony but by that of Dr. Carl Floe, a leading Metallurgist, that it is inconceivable that the cuts could have been made by cables, and that, in his opinion, the cuts were caused by a rather sharp instrument, which could have been a propeller blade.
 
 
 24
 As to the really controlling findings in fact 18, based upon Downs' testimony that the two planes came together in substantially level flight with the SNB pointing toward the DC-4, and striking the DC-4's left wing at an angle of 77 degrees, measured counter-clockwise from the nose of the DC-4, appellees argue that appellant's attempt to belittle and deprecate Downs' testimony completely failed both because of the innately truthful nature of it and because no adequate controverting evidence was offered by the government to rebut his testimony. They insist that this finding is especially strengthened and made impregnable by the fact that the opinion of Mr. Downs was consistent with the testimony of reliable eye witnesses, that the DC-4 was in straight and level flight on a general south-southwesterly heading and that the SNB was proceeding on a northwest and converging heading. Conceding that there was eye witness testimony offered by the defendant which contradicted this view, appellees, searching the record of the testimony of these witnesses, insist that this is a typical case for non-interference with the findings of the district judge since there were witnesses who swore positively that the DC-4 was on a normal straight and level flight and that it did not make any turn until after the explosion. Thus, though there were witnesses who testified to the contrary of this, it was for the district judge to resolve this conflict, and, especially since some of the defendant's witnesses who testified orally testified to having given earlier and conflicting statements, the district judge's choice of which witnesses to believe and which to disbelieve may not seriously be questioned here. In addition to the matters directly pointed out by the district judge in his findings of fact to support his view, that the negligence was not that of the DC-4 but of the SNB, the appellees point, as further evidence of negligence on the part of the defendant, to testimony showing: that, contrary to the provisions of Section 602 of the Key West Naval Air Station Regulations, those in charge of the SNB had not made any inquiries of the Civil Aeronautics Administration Office for altitude assignment and traffic information 'before commencing to fly the beam'; that, though the government contends that the unit to which the SNB was attached was not governed by this regulation, all of the Naval Air Station witnesses agreed that training flights were bound to proceed with due regard to commercial flights. In addition, one of them, Miller, testified that commercial air flights would not be expected overpassing Key West below an altitude of 6000 feet, while another, Ruehrmund, testified that the SNB was, at the time of the collision, flying higher than usual for such flights.
 
 
 25
 In this connection, appellees point to Aviation Circular Letter 97-47, plaintiffs' exhibit 37, No. 213, providing: 'Avoiding commercial or civilian airplanes: (a) Pilots must bear in mind at all times the fact that the average commercial airplane is relatively blind, pilots of naval aircraft shall give civilian aircraft a wide berth and whenever possible they shall not fly within 1000 feet of such aircraft. Pilots of naval aircraft shall not fly acrobatically or erratically in the vicinity of commercial transport aircrafts.'
 
 
 26
 Finally, pointing out that the evidence establishes: that, while the DC-4 applied for an altitude of 6000 feet, the authority was not able to give it that altitude but gave it 4000 feet because another plane had preempted the 6000 foot altitude; that according to the testimony of one of defendant's witnesses, naval planes did not expect commercial aircraft below 6000 feet; and that before the flight in question, no inquiry was made of the air station as to where such planes might be expected to be; appellees insist that this in itself tends to explain the whole affair and to place a heavy burden on the SNB to exonerate itself from fault.
 
 
 27
 Ignoring appellant's procedural points, appellee Cubana, upon the issues of damages, flatly disputes appellant's contention that any of the elements of damage claimed were improper elements, and insists that, since the total claims put forward and supported by evidence were over $700,000, and the allowance made was only $400,000, no error can possibly be asserted as to the amount allowed.
 
 
 28
 While viewed as a whole, the record is voluminous, consisting of nine volumes aggregating some 2500 pages, the volumes and pages containing the evidence having real relevancy to the issues joined, upon which the findings were based and the cause turned, constitute a much smaller record.
 
 
 29
 A careful reading of these parts, in the light of the respective contentions set out above, shows clearly, we think, that the case presented by plaintiffs for decision consisted of clear cut and specific testimony which, if credited, amply supported the court's findings that when struck the DC-4 was on its course in level flight and to the right of the SNB and thus had the right-of-way, and that the SNB, in violation of the rule requiring it to keep out of the way of the DC-4, negligently collided with it.
 
 
 30
 While therefore, it is true, as pointed out by appellant, that there was considerable evidence supporting the theory of defendant that the two planes were not on converging courses, with the DC-4, having the right-of-way, but that the DC-4 was on an overtaking or turning course and negligently came into collision with the SNB, the record presented a conflict of factual testimony which it was for the district judge, it is not for us, to resolve. We should not, therefore, indeed we may not, disturb his findings unless we find from the record as a whole that there was some misapprehension of the law or the facts on his part which produced a wrong result or prevented a right result from being reached.
 
 
 31
 Examining the record in the light of these views, we think we are bound to hold: that appellant has not sustained its burden to point these out; that appellees are right in their insistence that the positive eye witness evidence of Vintila, Witherington, and Taylor, together with the other credible evidence, amply supports the court's findings; and that it cannot be successfully urged that this court must find the district court in error because it failed to give credence to the counter testimony of defendant's witnesses.
 
 
 32
 It is true that the district judge did, in his findings, point, and seem to attach importance, to the safety record of Cubana and its pilots, that is to its and their past history of freedom from negligence and to evidence tending to show a contrary record as to some of those the SNB. It is true, too, that under the rule that habits of, or reputation for, care or negligence are not admissible if objected to and are of no real probative force if not objected to,[4] these considerations are entitled to no weight in the decision of the case. One reason for this ruling is said to be, 'that the bringing in of collateral matters broadens the inquiry, tends to confuse the jury as to the real issues involved and does not give the opposing party opportunity to disprove matters not raised by the pleadings.' Weaver v. Scofield, note 4 supra. For the reasons hereafter stated, however, this departure from accustomed and accepted procedure may not be regarded as reversible error.
 
 
 33
 The evidence upon which the court based these references in the findings was not, however, objected to, indeed it came in from both sides, and no claim of error in its reception is made, except the wholly untenable one that the court erred in rejecting evidence offered by defendant of specific earlier instances in which Cubana and its pilots were negligent. Further, as shown in the quotation above, the reason usually assigned for its not being received is to keep from the jury extraneous and irrelevant matter, and these considerations do not apply in a case tried to a court without a jury as here, because, as was well said in MacDonnell v. Capital Co., 9 Cir., 130 F.2d 311, at page 318:
 
 
 34
 Where 'the cause (is) tried to the court without (a) jury * * * questions * * * relative to the admission or exclusion of evidence * * * become relatively unimportant, the rules of evidence relating to admission and exclusion being intended primarily for the purpose of withdrawing from the jury matter which might improperly sway the verdict, and not for the trial judge, who is presumed to act only upon proper evidence.'
 
 
 35
 Cf. Rule 43, Rules of Civil Procedure, Note 83 on the issue of the admission of incompetent evidence in a case tried before the court, and Grandin Grain & Seed Co. v. U.S., 8 Cir., 170 F.2d 425, at page 427, where the court said:
 
 
 36
 '* * * In a nonjury case, the presumption is that the trial court based its findings and judgment solely upon the competent evidence received, and that it disregarded all incompetent evidence.'
 
 
 37
 and that:
 
 
 38
 '* * * it will not reverse a judgment in a nonjury case because of the admission by a trial court of incompetent evidence, unless all of competent evidence in the case is insufficient to sustain the judgment or unless it affirmatively appears that the incompetent evidence induced the trial court to make an essential finding which would not otherwise have been made. * * *'
 
 
 39
 This slight abnormality aside, however, the findings as a whole are not, we think, subject to just complaint. It is true, as the defendant complains, that the court attached great importance to the testimony of Downs. But when that testimony is read in the light of the whole record, including the long and vigorous cross-examination to which he was subjected, the failure of the defendant to offer any precisely controverting expert testimony, the positive supporting testimony of eye witnesses which conforms to and coincides with his conclusions, and the overall picture the evidence as a whole delineates, there can be no sound criticism of the district judge's having done so.
 
 
 40
 Without, therefore, undertaking to marshal and discuss, as the briefs have done, the testimony on which each side relies to support or overthrow the judge's findings, it is sufficient, we think, to say that we are of the clear opinion that the appellant has not sustained its burden of showing that plaintiffs' case failed on the theory; (1) that they offered no sufficient probative evidence of negligence to discharge their burden; or (2) that the evidence offered by them was so overborne by the testimony of the witnesses for, and other proof offered by, defendant, that this court must find that the district judge came to a clearly wrong result, that, in short, the findings must be set aside as clearly erroneous and the judgment reversed as without support in the evidence. Unless, therefore, appellant's complaints of procedural errors present reversible error, the judgments as to the defendant's appeals and its cross appeal must be affirmed.
 
 
 41
 We turn, then, to the claims of procedural error on which defendant relies for reversal. These, as appellant states them in its specifications of error, range from the generality and totality of No. 8, 'In conducting the trial with undue limitation of procedural rights of appellant and undue enlargement of procedural rights of appellees', to the particularity and specificity of Nos. 9, 'In erroneously limiting appellant's right to cross examine appellees' witnesses'; 10, 'In denying appellant's right to introduce testimony designed to counter the attempted impeachment of a witness'; 11, 'In excluding the evidence proffered by appellant on surrebuttal'; and 14, 'In failing to dismiss Cubana's damage claims other than that for the value of the DC-4 as being unfounded in law.'
 
 
 42
 In addition to these particularly specified claims, there may be added the admission of Clark's deposition in evidence, over the objection of defendant, that it had been neither read nor signed by him.
 
 
 43
 In taking these matters up to consider them, we must, of course, keep firmly in mind that this case was tried to the court without a jury, and that the governing rule here is that in a trial to a court without a jury a district judge is clothed with wide discretion, in admitting and excluding evidence and generally in the conduct of the trial, and that his judgment will be reversed upon claims of procedural errors only upon a clear showing that there was error and that the error was prejudicial. Cf. Rule 43, Note 2, 'Purpose', Rules of Civil Procedure, 28 U.S.C.; MacDonnell v. Capital Co.,supra; Grandin Grain & Seed Co. v. U.S., supra; Woodward v. United States, 8 Cir., 185 F.2d 134; and Downie v. Powers, 10 Cir., 193 F.2d 760.
 
 
 44
 An examination of appellant's claims of error, in the light of these principles, leads us to the firm conclusion that while some of the rulings complained of were indeed erroneous, considered individually or in their totality, they were not so prejudicial upon the record as a whole as to require the reversal of the judgments.
 
 
 45
 Of the rulings of which appellant complains, there are three and only three which we think were erroneous. The first of these was the admission of the deposition of Clark over the objection that it was not signed.[5] However, we think the objection was more technical than substantial and that, as defendant itself concedes, it was only cumulative evidence, and it seems to have gotten as much or more benefit from it than plaintiff did, and finally it did not deal with any seriously controverted matter. We feel, therefore, that the error in admitting such a deposition under such a certificate, in a case tried to the court without a jury was not prejudicial and therefore not reversible.
 
 
 46
 The second error was the refusal to allow the defendant to recall to the stand in surrebuttal the witnesses Ringer, Robinson and Grant, on the issue of whether the cuts dealt with in Downs' evidence were made by the SNB propeller blades, as claimed by plaintiffs, or by cables in salvaging the wing from the water, as claimed by defendant. It is true that the trial court has a wide discretion in dealing with matters of this kind, Sternberg Dredging Co. v. Moran Towing & Transp. Co., 2 Cir., 196 F.2d 1002, and that normally his action in respect of such matters may not be assigned as error. On the other hand, a court has no right to arbitrarily refuse to hear surrebuttal testimony. This is especially so here, in view of the ruling of the court made earlier in the course of the plaintiffs' rebuttal, that appellant would be given an opportunity to present evidence in surrebuttal. However, because of the fact that the testimony was merely cumulative, testimony substantially to the same effect having come in on defendant's case, and the further fact that the district judge heard the evidence in hearing the proffer and was apparently not influenced by it, we think that there is no basis for the view that if it had been allowed to come in as evidence, it would probably have induced a different judgment and, that it therefore, requires the holding that its exclusion was prejudicial error, requiring a reversal.
 
 
 47
 The third claim of error, which we think is to some extent borne out, is the claim that on occasional instances the judge did, for instance as shown at page 883 of the Record, limit the cross-examination of a witness. In the light, however of the voluminous, extensive and detailed cross-examination, we think these limitations must be regarded as not prejudicial.
 
 
 48
 From what we have said above, that three, and only three of the claimed errors dealt with by us are well founded, it follows that we are of the opinion that the rulings on the admissibility of evidence with respect to Cubana's claims of damages and the finding that there was sufficient credible evidence to support a judgment in Cubana's favor for $400,000, were not in our opinion erroneous. Indeed, contrary to appellant's position, we are of the clear opinion: that each and all of the elements of damage put forward and claimed were relevant and the evidence as to them was admissible. The fact that the court allowed only $400,000, when the testimony in the case would have sustained a much larger allowance, we think prevents the appellant from claiming that prejudicial error attended the award of damages to it.
 
 
 49
 On the appeals and cross-appeal of the defendant all the judgments are affirmed, except that, for the reasons hereafter stated, the judgments in Nos. 15390 and 15391 are modified and affirmed.
 
 
 50
 By their cross-appeals in Nos. 15390 and 15391, each of the plaintiffs, of the opinion that the damages awarded her are greatly inadequate, seeks to have the judgment increased in amount and, as increased, affirmed.
 
 
 51
 In support of her claim, each cross-appellant, invoking the rule of the Florida decisions[6] dealing with death damages, and marshaling the relevant evidence in each case, urges upon us that the award was so meager and inadequate under the undisputed evidence, of earnings, of life expectancy, and of what each might reasonably have expected to receive from her husband if he had lived, that this court is bound, after reading the record, to be left with the definite and firm conviction that in making it the district judge misapprehended the law or the evidence or both.[7]
 
 
 52
 Presenting and discussing the evidence, cross-appellant in the de Salas case insists that the award instead of $15,000 should have been $54,000, while the cross-appellant in the Pacheco case, where both husband and wife were younger, presses upon us that the award instead of $20,000 should have been $70,500.
 
 
 53
 On its part, cross-appellee, pointing to the settled law, that an appellant who seeks to upset an award for unliquidated damages, on the ground of excessiveness or inadequacy, is confronted with a hard and difficult task,[8] and to the well recognized rule of the Florida decisions that no strict group of criteria can be pointed to by which death damages may be mechanically or mathematically measured,[9] insists that, considering the evidence as a whole, it may not be said that the awards of the district judge were clearly erroneous.
 
 
 54
 We agree with cross-appellee that no fixed pattern may be set, no rule of thumb measurement employed, and that the district court has wide discretion in reaching an informed judgment in cases of this kind. We are, nevertheless, of the opinion that in making the awards in these cases the district judge has measured over meagerly, has too greatly minimized the favorable, too greatly magnified the unfavorable, considerations controlling here and that, if his judgments were reformed to award in the de Salas case $25,000 and in the Pacheco case $30,000, they would more nearly approximate what is right and just under the evidence in this case. The judgments will accordingly be so reformed and, as reformed, affirmed.
 
 
 55
 TUTTLE, Circuit Judge, concurs in the result.
 
 
 
 [1]
 Findings 12, 13 and 14 were as follows:
 '12. During the course of the instrument training maneuvers, it is the duty of the instructor to keep a check on the instruments and to watch the actions of the student pilot as well as to keep a lookout. To look to the right he would have to lean forward in order to see past the student on his right. The student pilot is forbidden to look outside the cockpit. The other student in the plane was expected to watch for other aircraft on the side opposite the instructor.* * *
 '13. The orange plastic material, which is placed over the cockpit windows when the plane is simulating instrument flying, is transparent and under proper condition does not affect the visibility of the occupants of the cockpit, other than the student pilot. This plastic material is held in place by metal clips.'
 '14. On the morning of April 25th at Key West the ceiling and visibility was unlimited, with a line of cumulus clouds running east and west on the horizon to the north of Boca Chica Naval Air Station. The base of these clouds was from 2300 to 2600 feet with the tops ranging up to 4600 feet.
 
 
 [2]
 '60.1 Scope. The air traffic rules in this part shall apply to aircraft operated anywhere in the United States, including the several States, the District of Columbia, and the several Territories and possessions of the United States, including the territorial waters and the overlying airspace thereof, except:
 '(a) Military aircraft of the United States armed forces when appropriate military authority determines that noncompliance with this part is required and prior notice thereof is given to the Administrator.'
 '60.10 Application. Aircraft shall be operated at all times in compliance with the following general flight rules and also in compliance with either the visual flight rules or the instrument flight rules, whichever are applicable.'
 '60.12 Careless or reckless operation. No Person shall operate an aircraft in a careless or reckless manner so as to endanger the life or property of others.'
 '60.14 Right of way. An aircraft which is obliged by the following rules to keep out of the way of another shall avoid passing over or under the other, or crossing ahead of it, unless passing well clear:
 Note: Right-of-way rules do not apply when, for reasons beyond the pilot's control, aircraft cannot be seen due to restrictions of visibility. The aircraft which has the right-of-way will normally maintain its course and speed, but nothing in this part relieves the pilot from the responsibility for taking such action as will best aid to avert collision.
 '(b) * * * When two or more aircraft of the same category are converging at approximately the same altitude, each aircraft shall give way to the other which is on its right. * * *'
 
 
 [3]
 '17. At 11:49 1/2 A.M. on April 25, 1951, the Navy SNB airplane, 39939, collided with Cubana DC-4 airplane, CU-T 188, at an altitude of about 4000 feet, approximately 100 yards west of Pier B, also known as Pier Baker, U.S. Naval Station, Key West, Florida. At the time of and prior to the collision, the air speed of the DC-4 was about 205 miles per hour, while the SNB was being operated at the air speed used in instrument training maneuvers which ranged between 105 and 140 knots, equivalent to approximately 120 and 160 miles per hour respectively. The point of collision was within a control zone and civil airway Amber 7. Prior to impact, the two aircraft were approaching each other such that the first contact was made between one of the two blades of the right propeller of the SNB and the leading edge and under surface of the DC-4's left outer wing panel at wing station 588 1/2. This blade cut through the leading edge of the wing, through the fuel tank access door and through the lower center spar cap and came out under the wing at a point about 20 inches to the rear of the center spar. The propeller continued to rotate and the other blade made contact with the DC-4's left outer wing panel at about wing station 540 1/2. This blade cut through the lower center spar cap and proceeded to cut entirely through the wing structure and aileron to the rear of the center spar. This cutting action at station 540 1/2 combined with the wedging action of the SNB sliding under the left wing of the DC-4 resulted in the loss of approximately 14 feet of the wing. The SNB disintegrated and the left outer wing panel and wing tip of the DC-4 were later found in the area where the wreckage of the SNB was found. The DC-4 continued for a few seconds in level flight, then banked to the left at an increasingly steep angle and crashed into the ocean about half a mile to the south of the Island of Key West. The crash of the DC-4 was caused by the damage which it sustained at the time of the collision.'
 '18. At the time of the collision the two aircraft were converging, with the Navy SNB approaching on the left side of the DC-4, and with the DC-4 aircraft on the right of the SNB as the two aircraft came together in substantially level flight. The angle of collision was approximately 77 degrees, measured counter-clockwise from the heading or longitudinal axis of the DC-4 aircraft, with the Navy SNB pointed toward and striking under the left wing of the DC-4. The possible variation in this angle, which is based upon calculations made from measurements of the propeller cuts, amounts to less than 5 degrees in either direction, assuming all possible speeds for the SNB within its range of 105 to 140 knots. This angle between the two aircraft as the Navy SNB approached and struck the under side of the left wing of the DC-4 is consistent with the testimony of reliable eye-witnesses who were on the ground near the point of collision, and whose evidence confirms the fact that the DC-4 was in straight and level flight on a general southerly to southwesterly heading with the SNB traveling in a northwesterly direction.'
 '19. Both aircraft were a total loss. The Cubana aircraft carried 34 passengers and 5 crew members, and the Navy SNB carried four crew members. There were no survivors.'
 '20. Cubana had a splendid safety record up to the time of this accident and had experienced no fatality in over 17 years of operation. Captain Bazan was a pilot with over 20 years' experience and thousands of hours in the air. At the time of the collision his aircraft was being operated precisely in accordance with the clearance issued by Miami Air Route Traffic Control, i.e., at the assigned 4000 foot altitude, and the flight was punctual with respect to its estimated time of arrival over Key West. The Navy SNB was a highly maneuverable aircraft. It was the duty of the SNB aircraft to obey the right-of-way regulations which, in this instance, required it to give way to the DC-4 aircraft, and there was no reason for the pilot in command of the DC-4 to believe that the Navy plane would continue on its course into collision. Unknown to the pilot of the DC-4, the ability of the student pilot sitting on the right side of the cockpit of the Navy SNB to observe the DC-4 was entirely obliterated by the combination of his goggles and the Plexiglass, as he was practicing instrument flying and was not permitted to orient himself by looking outside the cockpit. It was customary for the instructor to watch the instrument panel to observe the carrying out of instructions given to the student flying the aircraft and the mistakes, if any, made by him. When this situation is considered, together with the fact that it was the duty of the Navy SNB to alter its course so as to give the right-of-way to the DC-4, no other conclusion can be reached but that those in the Navy SNB negligently failed to observe the approach of the DC-4 although it was well within the range of normal vision, had they been alert and keeping a proper look-out.'
 '21. Those in the Navy SNB aircraft 39939, having piloted it in such a manner as to place it on a converging course with the Cubana DC-4 aircraft CU-T 188 on its right were negligent in that they did not 'give way' as required by the applicable Civil Air Regulation, Section 60.14(b).'
 '22. Negligence of the defendant's agents in charge of Navy SNB aircraft 39939 was the sole and proximate cause of the collision, and neither the plaintiff nor its agents in charge of DC-4 aircraft CU-T 188 were negligent.'
 
 
 [4]
 38 Am.Jur., 'Negligence', sec. 320-321; Weaver v. Scofield, Mo.App., 198 S.W.2d 240, 242; Murphy v. Burney, Miss., 27 So.2d 773; Glass v. Houston Singing Society, Tex.Civ.App., 192 S.W.2d 300; 65 C.J.S., Negligence, § 237, pages 1058-1059. See also Missouri, K. & T. Ry. Co. v. Johnson, 92 Tex. 380, 48 S.W. 568. Cf., however, Cunningham v. Austin & N.W.R. Co., 88 Tex. 534, 537, 31 S.W. 629
 
 
 [5]
 The notary taking the deposition, testified under oath:
 'The deposition of Martyn V. Clarke was taken before me on Jan. 18, 19, and 20, 1954. On February 20th I wrote Mr. Clarke requesting his signature. A few days later he phoned me advising it would take some time to read the deposition and arrangements were made to furnish him with a copy. On March 2, the copy was delivered to him.
 'Today, April 6, Mr. Clarke advised me that he would have to decline to sign the original copy of the deposition, although a copy was made available to him some time ago, as he had not had an opportunity to read the deposition due to being out of town in the performance of his duties. He will sign it later, after reading it, if it is so desired.'
 
 
 [6]
 "The widow's claim for damages for the death of her husband by the wrongful act of another is based on the following elements: (1) Her loss of the comfort, protection, and society of the husband in the light of all the evidence in the case relating to the character, habits, and conduct of the husband as such. (2) The marital relations between the parties at the time of and prior to his death. (3) His services, if any, in assisting her in the care of the family. (4) The loss of support which the husband is legally bound to give the wife, and which is based on his probable future earnings and other acquisitions. (5) The station in society which his past history indicates that he would probably have occupied and his reasonable expectations in the future, such earnings and acquisitions to be estimated upon the basis of deceased's age, health, business capacity, habits, experience, and energy, and his present and future prospects for business success at the time of his death-- all of these elements to be based upon the probable joint lives of the widow and husband. (6) She is also entitled to compensation for loss of whatever she might reasonably have expected to receive in the way of dower or legacies from her husband's estate in case her life expectancy be greater than his-- the sum total of all these elements to be reduced to a money value, and its present worth to be given as damages." Seaboard Air Line R. Co. v. Martin, Fla., 56 So.2d 509, 513; Dina v. Seaboard Air Line R. Co., 90 Fla. 558, 106 So. 416
 
 
 [7]
 Sanders v. Leech, 5 Cir., 158 F.2d 486; U.S. v. Guyer, 4 Cir., 218 F.2d 266; Ginsberg v. Royal Ins. Co., 5 Cir., 179 F.2d 152
 
 
 [8]
 Authorities note 2, supra
 
 
 [9]
 Cf. Frazier v. Ewell Engineering & Contracting Co., Fla., 62 So.2d 51, 54, where the court said: 'There can be no fixed formula or mathematical certainty with reference to many items which should be considered by a jury in assessing damages in a case of this kind.'