**AUNT MID, INC., Plaintiff-Appellant,**

v.

**FJELL–ORANJE LINES et al.,**
**Defendants-Appellees.**

**No. 18891.**

United States Court of Appeals,
Seventh Circuit.

Feb. 8, 1972.

Rehearing Denied April 19, 1972.

Zeamore A. Ader, David Lincoln Ader, Ader & Ader, Chicago, Ill., for plaintiff-appellant.

Michael A. Snyder, Daniel K. Schlore, Chicago, Ill., for defendant Oranje Lijn (Maatschappij Zee Transport) N.V.; Bradley, Eaton, Jackman & McGovern, Chicago, Ill., of counsel.

Jonathan G. Bunge, Robert A. Creamer, Chicago, Ill., for defendants Fjell-Oranje Lines, et al.; Price, Cushman, Keck & Mahin, Chicago, Ill., of counsel.

Before KNOCH, Senior Circuit Judge, and KERNER and PELL, Circuit Judges.[1]

PELL, Circuit Judge.

Although the sea was clearly less than boiling hot, the defendants' ships equally

---

1. Judge Kerner heard oral argument, but did not participate in the adoption of this opinion.

clearly delivered cabbages far less than fit for kings.[2] Therefrom arose this lawsuit.

Plaintiff Aunt Mid, Inc. appeals from the judgment of the district court holding the defendants not liable for the spoilage of two cargoes of Danish cabbage carried from Rotterdam, The Netherlands, to Chicago, Illinois, aboard ships chartered by the defendants, the Ghanaian *Motor Vessel Pra River* and the Norwegian *Motor Vessel Sirefjell*. Plaintiff sought recovery of $10,500 for the damage to the cabbages on the *Pra River*, and $6000 for the cabbages on the *Sirefjell*.

The Carriage of Goods by Sea Act (COGSA), 46 U.S.C. §§ 1300–1315, governs these consolidated actions. Aunt Mid contends that it delivered the cabbage to the vessels in good condition and that as a result of the defendants' negligent stowage and carriage the cabbages were rotten upon arrival in Chicago. It further claims that the *Pra River* and the *Sirefjell* were unseaworthy.

Aunt Mid, Inc. makes cole slaw and tossed salads for retail sale. In 1966, the president of Aunt Mid, Russell LaMantia, entered into a joint venture on behalf of his company with Suffolk Farms Packing Company of Massachusetts to purchase Danish cabbage from Holland. Arnold Wolf of Suffolk Farms represented the joint venture in the purchase and inspection of the cabbage in Holland.

The two firms jointly purchased 500 tons of cabbage in Holland in late October or early November 1966. All 500 tons came from two sources: a cabbage dealer from whom 350 tons were purchased and a farmer from whom 150 tons were purchased. Aunt Mid's share of the joint purchase was 100 tons. The testimony was vague as to whether Aunt Mid's cabbages came from both the farmer and the dealer. Plaintiff asserts that the cabbages from the two sources were inter-mixed in shipment. This, no doubt, is true as to the total 500 ton shipment which was spread through approximately sixteen ships; however, it is far from clear that the specific cabbages involved in this case, which were carried on two ships only, came from both sources. Further, as to the 350 tons from the dealer, there is a paucity of evidence on such significant matters as to how many farmers may have produced these cabbages and as to the care they may have received prior to their being loaded aboard the vessels.

Wolf first inspected the 150 tons of cabbage in the farmer's holding house in the latter part of November or early December 1966. The farmer had grown all his own cabbages and had stowed them in the holding house, wherein they were the only cabbages. Wolf testified that he found the farmer's cabbage to be good, solid cabbage and properly handled. Accompanied by LaMantia, he revisited the holding house in February 1967. The cabbages were again found to be good and professionally handled. The cabbages purchased from the produce dealer were never personally observed by either Wolf or LaMantia prior to shipment. As indicated hereinbefore, there was no evidence as to how they were stored and cared for after harvesting or what their pre-voyage condition was.

We find no reason for qualifying this observation because of Aunt Mid's assertion that there was such evidence in the form of certain governmental certificates and bills of lading. We discuss the probative value of these items hereinafter.

The cabbages bound for Aunt Mid's in Chicago were packed in 50 pound mesh bags a few days prior to being shipped and were carried to the port in closed trucks, where they were placed on four vessels, the voyages of only two of which are the subject of this action.[3] LaMantia

---

2. With appropriate respect to the memorable dissertation anent many things by Lewis Carroll's vocal walrus.

3. Of the shipments bound for Aunt Mid, Inc. at Chicago, the first contained 900 bags, the second, on the *M.V. Pra River*, contained 1800 bags, the third, on the *M.V. Sirefjell*, contained 900 bags, and the fourth contained 900 bags.

requested that all the cabbages be shipped in ventilated stowage. The bills of lading issued by the vessels recited that the goods were to go "Hold Stowage."

The *Pra River* cabbages were stowed on board on April 15, 1967, as ordinary or general cargo, not as perishable cargo. The trip from Rotterdam to Chicago took 24 days, and the ship encountered temperatures ranging from approximately 32° to 52° F., the latter while on the Gulf Stream. On arrival at Chicago, the cabbages were decayed, gave off a strong rotting odor and were discolored black. A surveyor from the Department of Agriculture found that the cabbages suffered from bacterial soft rot. Before leaving Holland, the cabbages had received certification from the Phyto-sanitary Service (Plant Protection Service) of The Netherlands and the Export Control Bureau. Also, the vessel had issued a bill of lading stating that the cabbages were in "apparent good order and condition."

The cabbages to be shipped on the *M. V. Sirefjell* were taken on board on April 22, 1967, and were placed in a reefer compartment (but without the refrigeration turned on) as general cargo. Seven days at sea, the Chief Mate smelled the cabbages and ordered the refrigeration to be activated. The trip to Chicago took 26 days, during which time the ship encountered temperatures again ranging from 32° to about 52°. The cabbages on arrival were discolored black, were wet and running in part and had a rotting odor. The Department of Agriculture inspector found that the cabbages suffered from both bacterial soft rot and watery soft rot.[4] As in the case of the *Pra River* cabbages, the *Sirefjell* cabbages had received certificates from two Dutch agencies and a "clean" bill of lading from the vessel.

The rot in both shipments was general throughout. Because the cabbages were deemed unfit for consumption, the United States Bureau of Customs destroyed them.

The defendants contend that under the applicable law, a shipper, as a condition precedent to recovery, must establish the good order and condition of the goods shipped. He must prove, in the case of perishables such as cabbages, that the goods will survive the voyage booked. The district court below found that Aunt Mid failed to carry this initial burden.

The defendants also pleaded two affirmative defenses, either of which, they claim, would absolve them from liability: (1) that the damage resulted from an "act or omission" of the shipper (46 U.S.C. § 1304(2) (i)) and (2) that the damage resulted from an "inherent vice" of the goods (46 U.S.C. § 1304(2) (m)). The "act or omission" was the decision of Aunt Mid's president to ship the cabbages in hold stowage rather than under refrigeration to save freight costs. The "inherent vice" alleged was the presence of various bacteria, spores and fungi—which were invisible to the human eye—on the cabbages at the time of loading. These bacteria allegedly multiplied and caused the cabbage to decay. The district court held that the defendants had proved both the affirmative defenses.

Aunt Mid has urged that the defendants could not rest with the affirmative defenses. They assertedly also bore the burden of proving their freedom from negligence. The defendants have maintained that their showing that the damage resulted from an excepted cause eliminated the need for them to prove their freedom from negligence. In any event, the district court did consider the question of the carriers' negligence and the vessels' alleged unseaworthiness. It concluded that the cabbages were properly and unnegligently stowed and that the vessels were seaworthy.

■ Preliminarily, we note that this court is bound by the "clearly erroneous" test of Fed.R.Civ.P. 52(a). Our decision

---

4. One of the defendants' expert witnesses stated that, on the basis of black and white photographs of the cabbages that he was shown, the cabbages also suffered from the disease of alternaria.

here reflects use of that test. Rules 1, 81 (a), Fed.R.Civ.P. *See also* McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954), modif. denied, 348 U.S. 957, 75 S.Ct. 447, 99 L.Ed. 748 (1955).

We cannot agree with the plaintiff's argument, advanced in its reply brief, that the "clearly erroneous" rule is inapplicable to this case because there was little conflicting testimony and, therefore, there would be no need to rely on the trial judge's ability to view the witnesses and to make the ordinary determinations based on credibility factors.

We need not address ourselves to the somewhat divergent views on the scope of appellate review where the findings are based solely on documentary evidence or undisputed facts (see 2B W. Barron and A. Holtzoff, Federal Practice and Procedure §§ 1132, 1134 (Wright ed. 1961 and Supp.1970)). Here there was conflicting oral testimony, and the district court obviously did not find all witnesses equally credible. We reject the plaintiff's suggestion, the effect of which would be for this court to try the case de novo.

We also are constrained to remark upon the manner in which Aunt Mid challenged the district court's findings of fact. It did not help to clarify the issues for us in a close and complex case. The plaintiff discussed specific findings only in its reply brief, thus allowing the defendants no opportunity via brief to answer those challenges point by point. Such a deferring procedure increases the difficulty of an appellate court's reviewing task.

The parties agree that bacteria "caused" the cabbages to rot. Their experts seem to agree that certain conditions must be present for the bacteria to multiply to such an extent that they endanger the wholesomeness of the vegetables. However, the parties disagree as to who is to bear the fault for the cabbages' deterioration. By their

affirmative defense based on 46 U.S.C. § 1304(2) (i), the defendants are basically maintaining that the growth of the bacteria resulted from Aunt Mid's failure to ship the goods under refrigeration. The plaintiff insists that the defendants' negligence brought about the "immediate cause"—that is, the disastrous multiplication of destructive bacteria—or, at least, contributed to its occurring.

With regard to the defendants' affirmative defense of act or omission of the shipper,[5] the defendants rely primarily on an exchange of letters between Arnold Wolf of Suffolk Farms and Russell LaMantia of Aunt Mid. The following language in a March 27, 1967, message from Wolf to LaMantia is crucial for the defense:

"Wolf & Wolf [the Dutch firm with which Wolf was also associated] is of the opinion that cabbage to the Great Lakes with a voyage of three weeks should be shipped under refrigeration.

$\cdot \qquad \cdot \qquad \cdot \qquad \cdot \qquad \cdot \qquad \cdot$

"[Y]ou should bear in mind that there is a certain risk involved, while under refrigeration you will practically have no risk. The decision and responsibility is of course entirely yours."

The district court considered this language to be of substantial significance as reflected in the following part of the fourth conclusion of law:

"[T]he evidence shows that the plaintiff compared the freight rates applicable to ventilated hold and refrigerated stowage; then, against the advice of its agent, Mr. Wolf, and contrary to the usual and customary industry practice, it elected to take the risk of shipping the goods in ventilated hold stowage in order to save $1,560.00 in freight rates. The plaintiff represented to the vessel's [sic] agent that the goods would carry in ventilated space for a period of twenty-one days; that they would not was evident from the condition of the goods at discharge.

5. As we mentioned above the defendants also pleaded the affirmative defense of "inherent vice," 46 U.S.C. § 1304(2) (m).

To decide the case before us, we find it unnecessary to reach that issue.

Had the plaintiff elected to ship the goods under refrigeration at approximately, but not lower than 32 degrees, the loss would not have occurred.

. . .

"The plaintiff gambled when he shipped the cabbages in a ventilated hold rather than under refrigeration. This act, together with the tendency of the goods to spoil at temperatures in excess of 40 degrees, caused the loss. . . ."

The plaintiff calls to our attention another sentence in the March 27th letter: "Salvi is *inclined* to agree with you to ship it in ventilated space." [Emphasis supplied.] According to LaMantia, "Salvi" referred to Salvi Detouche, who performed the same function for Suffolk Farms that LaMantia performed for Aunt Mid, that is, buying and selling fresh vegetables and supervising the packaging of them. LaMantia further stated that he highly valued Detouche's opinion.

Wolf was called as a witness by the plaintiff. It was Aunt Mid who stressed Wolf's qualifications: he was a veteran importer-exporter of vegetables, and he knew a great deal about cabbages. The district court had the opportunity to observe Wolf's demeanor and to evaluate his credibility. We will respect the court's reliance on Wolf's expert opinion.

In a further attempt to minimize the effect of Wolf's opinion expressed in the March 27th letter, Aunt Mid refers to testimony by Wolf that, until the advent of containerization, he usually shipped goods from Holland to the United States in ventilated stowage. The plaintiff also points out that Wolf recalled instances where cabbages had been successfully carried to the United States by ship in ventilated stowage as late as July of the year following harvest.

On cross-examination, the defendants elicited from Wolf that his above remarks had reference to voyages from Holland to the east coast (New York, Boston) of the United States, voyages which take approximately nine days. In light of his findings, we infer that the trial judge decided that the difference in time between trips from Holland to the east coast and from Holland to Chicago greatly limited the applicability of Wolf's remarks. We find no clear error in the court's apparent conclusion that Wolf's testimony did not prove that the use of ventilated stowage was customary and usual for voyages from Holland to Chicago.

The defendants put in evidence a handbook written by their witness, Dr. Ramsey, a pathologist. That book states that "[s]hipments to distant markets should be refrigerated at 40 to 45 degrees Fahrenheit during transit." In its findings of fact, the district court found that refrigeration to at least 40 to 45 degrees was the usual and customary industry practice for shipments to distant markets. As previously noted, in its fourth conclusion of law, the court stated, "had the plaintiff elected to ship the goods under refrigeration at approximately, but not lower than, 32 degrees, the loss would not have occurred."

Aunt Mid contends that the district court's conclusion is inconsistent with its findings and with the expert testimony at trial. We cannot deny that there was some confusion and confliction as to exactly what was a safe temperature and at what thermal points the spoiling propensities of cabbages would be almost completely controlled, merely retarded or vigorously accelerated.

The conflicts illustrate the necessity for resolution thereof on a credibility basis by the district court. Further, we do not find the inconsistencies more than apparent inasmuch as there was supporting evidence that the diseases would not be unduly deleterious at the 40 to 45 degree range.

While primary attention seems to have been directed during the trial to temperatures at various times and places, there was also testimony indicating that high humidity would provide the setting for the rapid growth of the destructive organisms. Exactly what the relative humidity was at the time of the

shipments here involved is not clear in the record.

Other argumentative contentions are advanced by Aunt Mid of similar ilk to these previously mentioned, all of which are directed at the conflicting testimony, with the apparent underlying premise that the opinions advanced by plaintiff's witnesses are inherently more believable. If, arguendo, and as a matter of first impression, this were so, we are not on appellate review "left with the definite and firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). No purpose is served, other than unduly lengthening this opinion, by a further detailed analysis of each claimed factor affecting or not affecting the ocean voyage of these particular cabbages. Sufficient has been set forth herein to demonstrate the necessitous and determinative applicability of the clearly erroneous rule.

■ Even if, as Aunt Mid urges, the district court's findings are not completely internally consistent and do contain a few inaccurate summaries of the testimony, we conclude that they sufficiently inform us of the evidentiary bases for the district court's decision. Hence, in light of the evidence discussed above, we are unpersuaded that the district court erred in determining that the plaintiff gambled in using ventilated stowage rather than refrigeration and that it should bear the loss resulting from the election.

As the court stated in Commodity Service Corp. v. Boston Ins. Co., 1964 A.M.C. 926, 939 (S.D.N.Y.1964), aff'd *sub nom.* Commodity Service Corp. v. Hamburg-American Line, 354 F.2d 234 (2d Cir. 1965), "The temperatures to which the fatbacks were exposed while on the carrier's pier and in the course of ocean transit must be deemed the risk of the shipper since the plaintiff elected not to contract for specially cooled treatment either at the pier or in transit."

What we have said with regard to the issue of "act or omission" is equally applicable to the other principal issues raised by Aunt Mid, *i. e.,* whether the defendants were negligent, which negligence was an efficient cause of the deterioration, and whether the vessels in question were unseaworthy.

■ Piercing through the weltering contentions—that there was inadequate ventilating equipment, that cabbages were stowed so as not to be readily accessible for inspection, that outside fresh air could not be introduced but only stale air was recirculated, that one hold was excessively warm because near the engine room, that proper steps were not taken to investigate the deterioration, that some cabbages were stowed on top of heat-generating merchandise, and variations of the foregoing—we eventually find ourselves with the conviction that irrespective of how we might have decided the issues on the conflicting testimony relating thereto, we are unable to say that the findings of fact are clearly erroneous or that the conclusions of law based thereon require a reversal.

■■ Upon analysis it appears that plaintiff Aunt Mid was really seeking a trial de novo on this appeal. However, "[t]his Court, upon review, will not retry issues of fact or substitute its judgment with respect to such issues for that of the trial court. . . . In determining whether there is a sufficient evidentiary basis for the court's findings of fact, we must take that view of the evidence and the inferences deducible therefrom which is most favorable to the . . . [party prevailing below]." Cleo Syrup Corp. v. Coca-Cola Co., 139 F.2d 416, 417–418 (8th Cir. 1943), cert. denied, 321 U.S. 781, 64 S.Ct. 638, 88 L.Ed. 1074 (1944). *Accord:* Shapiro v. Rubens, 166 F.2d 659, 665, 666 (7th Cir. 1948).

The position which we have reached on the issues hereinbefore discussed is well stated in the language of Judge Hastings in Prince v. Packer Mfg. Co., 419 F.2d 34, 38 (7th Cir. 1969), as follows:

"In sum, since it is left to the trial court to weigh the evidence, resolve

any conflicts, draw inferences, determine the credibility of witnesses and declare the result, we hold there is substantial evidence in the record as a whole to support the challenged findings. Further, not having a firm and definite conviction that a mistake has been committed, we hold that the findings of fact and conclusions of law based thereon are not clearly erroneous."

Aunt Mid also claims reversible error arising from certain of the district court's rulings excluding proffered evidence. In directing our attention to these matters we do so in the light of the fact that this was a bench trial. The exclusion of evidence which should properly have been admitted is much more susceptible to having a disastrous effect upon the litigant's cause where a jury is involved as contrasted to the bench trial, where the finder of fact has heard the evidence in dispute in the form of a proffer and may well have decided that no weight whatsoever would be accorded to it even if technically admitted. *Cf.* United States v. Compania Cubana de Aviacion, S.A., 224 F.2d 811, 822 (5th Cir. 1955).

The first ruling challenged pertains to the phytosanitary certificates issued by the Plant Protection Service of The Netherlands, an official department of the Dutch Government. Their authenticity and genuineness were not questioned, but the court permitted them in evidence only for the fact that they had been issued. The court would not admit them for the truth of their statements, which were to the effect that the cabbages were "thoroughly examined . . . and were found . . . to be substantially free of injurious diseases and pests." Aunt Mid relies on 28 U.S.C. §§ 1732(a) and 1741.

■ While the admission of this evidence would seem to be directed in part at least to the inherent vice issue which we have not deemed necessary to consider, we are of the opinion that the district court's ruling was correct in any event.

This was not a situation where a certificate recorded a purely factual matter, such as the number of bags of cabbage, whether they were any objective visual evidences of bruising or other damage to the cabbages, or even that the shipment was in apparent good condition. Here the "truth" which Aunt Mid wanted in evidence was an opinion that the cabbages were free of injurious diseases. In view of the testimony of the nature of the particular diseases attacking the cabbages, it appears clear that something more than a mere routine visual examination or inspection would have been required to support the opinion. The district court correctly pointed out that the piece of paper could not be cross-examined, and the inspector could not be.

As this court stated in United States v. Bohle, 445 F.2d 54, 65 (7th Cir. 1971), " . . . the party to be confronted by such an opinion should have the full opportunity of cross-examination. We must also keep in mind that cross-examination deals not only with the basis and content of an opinion but with the professional qualification of the person rendering the opinion."

The distinctions that this court made in *Bohle, supra,* are applicable here.

We have no particular doubt on the evidence in this case that the cabbages were in apparent good condition,[6] or at least were substantially so, at the time of embarkation; but that is not, in view of the particular disease or diseases here involved, the crucial question.

Aunt Mid's next contention of error on evidentiary rulings was the striking from the testimony of evidence concerning the fact that several other shiploads of cab-

---

6. Indeed, during the course of the trial when ruling upon an objection to a hypothetical question, the district court observed, "[n]obody ever tested it to see how good the condition was. Nobody could see, based on what witnesses have been here, what the condition was except *apparently* it was in good condition." [Emphasis supplied.]

bages from the same sources, bagged the same way, shipped in ventilated stowage from Rotterdam to the United States in the same period of time and held for the same length of time were found to be in excellent condition.

■■ At the outset it must be noted that 12 of the shipments went only to the east coast of the United States and not to Chicago via the St. Lawrence and Great Lakes. The east coast voyage was considerably shorter, and we have no difficulty in affirming the district court's exclusion of this particular evidence. The evidence here with regard to the other two ships going to Chicago presents a closer question. However, upon analysis, despite continued efforts on the part of the plaintiff during the trial to show similarity of conditions and circumstances, we do not find that those efforts were crowned with sufficient success to make this evidence necessarily admissible. It appears clear from an overall view of the evidence and the findings of fact that the district court would have given no weight to this particular evidence which was proffered.

Looking at the evidence we are unable to state why cabbages on two ships arrived in Chicago in satisfactory condition and cabbages on two other ships did not. Likewise, we are unable to state why one bowl of fruit on a dining room table will appear to be blessed with relative immunity to natural decay when the following week a bowl of similar fruit in the same dining room will succumb rapidly to the ravages of time or disease. We are primarily concerned here with the two ships which delivered the damaged cargo. The district court having found that the cabbages were not negligently stowed, that the vessels were not unseaworthy and that the difficulty arose from an act or omission of the plaintiff, all of which we have found not to be clearly erroneous, we cannot say that the exclusion of the particular evidence was prejudicial to the plaintiff.

As we have already noted, it was not clear that the two shiploads in question necessarily came from the same source as the other shipments to the United States. This is an initial stumbling block which plaintiff did not surmount in attempting to show sufficient similarity of conditions or circumstances so as to make the evidence admissible.

Looking at the matter from another point of view, if the evidence had been admitted without more proof of similarity of conditions and circumstances than was here brought forth and the eventual judgment had been for the plaintiff, the defendant would have been in a position justifiably to have attacked the judgment founded in part on such evidence.

Finally, and in any event, this evidence is offered solely on the issue of the inherent vice, which issue we have not found it necessary to reach in deciding this case.

Aunt Mid next contends that the court committed reversible error in not permitting its rebuttal witness, plant pathogolist Malcolm C. Shurtleff, to answer the following question:

"In your opinion, as an expert, Doctor, as a practical matter, would it be reasonably safe to ship cabbages from mid-April to mid-May from Holland, across the Atlantic, down the St. Lawrence to the Port of Chicago in well-ventilated stowage when the temperatures on the Atlantic ranged between 32 degrees and 54 degrees?"

The offer of proof indicated that the witness would have answered "Under well-ventilated stowage, yes."

Plaintiff complains, probably justifiably, that the district court sustained a general objection which specified no grounds and, when asked as to the grounds of the sustaining of the motion, the court merely replied that "the record discloses the grounds."

■ Notwithstanding that the matter now under consideration occurred near the close of a five day bench trial, which the court rather obviously was trying to bring to a terminal status and during which all of the matters encompassed in the particular question and the expected answer had been thoroughly ventilated

for the court, nevertheless, in the particular situation here involved it would seem it might have been better practice for the court to have satisfied counsel's request and to have stated the grounds on which the objection was sustained.

Aunt Mid refers to the question as being a hypothetical question and contends that if the objection had been sustained on the ground that some elements had been left out of the question, a specification of the ground for the ruling would have enabled counsel to have corrected the question. While the question does not strike us, in form, as a typical hypothetical question, nevertheless, there is some validity in the contention and without the record showing the basis for the sustaining of the objection, it is necessary for us to look at the record to which the court referred to see if there was any prejudice to plaintiff by the exclusion. We are of the opinion that there was none.

The question is a close one and was not made any less so by the fact that an expert pathologist called by the defendants had been permitted to testify over an objection that he had an opinion that the ordinary prudent shipper of cabbages would be taking a big gamble to ship cabbages which had been in ventilated storage in Holland for a period of approximately 4½ months on an ocean voyage expected to take approximately 21 days in unrefrigerated stowage. Indeed, the district court placed reliance on this particular testimony in the conclusions of law.

However, it becomes so obvious as to be beyond argument that even if there had been a technical admission of the proffered answer to the question the district court would have been of the opinion that the prudent shipper would not have taken the gamble. There was evidence already before the court during the five days of trial that some shippers thought it was safe to ship cabbages in non-refrigerated stowage and some did not. The district court was aware of the difference of opinions held by the experts, and we cannot say the court was wrong in finding the elements of a gamble in this very difference.

Further, the particular proposed answer would merely have had a cumulative summary effect, as Dr. Shurtleff had already testified in detail about the impact of various conditions and their influence upon the development of the disease, the clear import of which was that proper ventilation on the ship would have substantially prevented the condition's developing. The proposed question and answer really added nothing more.

Finally, after extended colloquy on additional hypothetical questions, the court suggested that defendants discontinue objections, let the witness answer, and then the defendants could deal with him on cross-examination. Dr. Shurtleff was then permitted to testify in response to a hypothetical question that he thought the ventilation on the defendants' ships was inadequate. This was the crucial part of his testimony, and we cannot find that the technical exclusion of the summation answer to the opinion question was such as to constitute reversible error.

In sum, it was fully before the district court that there were differences of opinion as to the practical safety of shipping cabbages as they were here shipped, and we are not convinced that there would have been any change in the finding of fact by the mere act of admitting the somewhat vague opinion, which we do not deem as having any additional probative value.

We have considered other claimed errors and do not find cause for reversal.

For the reasons hereinbefore set out, the judgment of the district court is affirmed.

Affirmed.