Beryl Whiteman STILES

v.

NATIONAL AIRLINES, Inc.

N. H. CONDER, duly qualified Administrator of the Estate of W. B. Schnorbus, and duly qualified legal guardian for and on behalf of Vicky Ann Schnorbus, and next friend, and as a personal representative and next friend on behalf of Mrs. Joe Schnorbus and Mrs. Lula Conder

v.

NATIONAL AIRLINES, Inc.

and

N. H. CONDER, duly qualified Administrator of the Estate of Mrs. Clara Conder Schnorbus, wife of Walter B. Schnorbus, and duly qualified legal guardian for and on behalf of Vicky Ann Schnorbus and next friend, and as personal representative and next friend on behalf of Mrs. Lula Conder

v.

NATIONAL AIRLINES, Inc.

Nos. 2509, 2688, 2697.

United States District Court
E. D. Louisiana,
New Orleans Division.

March 27, 1958.

———◆———

Deutsch, Kerrigan & Stiles, Rene H. Himel, Jr., Ralph L. Kaskell, Jr., William S. Stone, New Orleans, La., for libellant Stiles.

Liddell, Austin, Dawson & Huggins, Dwight Austin, Houston, Tex., and Byrnes & Wallace, New Orleans, La., for libellant Conder.

Porteous & Johnson, F. Carter Johnson, Jr., New Orleans, La., and Dixon, DeJarnette, Bradford & Williams, H. Reid DeJarnette, Miami, Fla., for respondent.

CHRISTENBERRY, Chief Judge.

The foregoing matters having been consolidated for trial, and having been tried to the Court without a jury, the Court having heard evidence and the arguments of proctors, and having taken time to consider the matters, hereby makes the following findings of fact and conclusions of law:

### Findings Of Fact

1—Beryl Whiteman Stiles, Libelant in No. 2509, is the surviving spouse of Harry F. Stiles, Jr., intestate deceased, who left no surviving parents, children or other dependent relatives.

2—N. H. Conder, Libelant in No. 2688 and No. 2697, is the duly qualified Administrator of the Estates of Walter B. Schnorbus and Mrs. Clara C. Schnorbus, wife of Walter B. Schnorbus, respectively, and legal guardian for and on behalf of Vicky Ann Schnorbus, and next friend, and as a personal representative and next friend on behalf of Mrs. Joe Schnorbus and Mrs. Lula Conder.

3—At all material times, respondent, a Florida corporation, was a common carrier of passengers for hire by air between the cities, among others, of Miami, Tampa and New Orleans.

3a—On the afternoon of February 14, 1953, libelants' intestates were traveling on one of respondent's airplanes (Flight 470), under a regular contract of passage, from Miami via Tampa across the Gulf of Mexico to New Orleans. Said airplane, while en route from Tampa to New Orleans, encountered a storm, and, at about 6:12 PM, crashed in the Gulf of Mexico off the coast of Alabama, beyond a marine league from shore, killing libelants' intestates and all other persons aboard. (All times are stated herein as Eastern Standard Time.)

4—Respondent, unlike certain other airlines, does not maintain its own meteorological department. Instead, the dispatchers stationed in respondent's Flight-Control office in Miami are charged with responsibility for keeping respondent's flights advised of weather conditions. These dispatchers are not trained in meteorology, although such training is customary in the case of other commercial airlines.

5—The United States Weather Bureau officially defines "severe turbulence" as: "Rare. Usually impossible to control aircraft. May cause structual damage." Volume III, Service Operations, Chapter B–20, Aviation Forecasts.

6—Of the two dispatchers who were responsible for the safety of respondent's Flight 470 on February 14, one was of the opinion that turbulent weather on a projected flight route was unimportant in respect of the safety of the flight; and the other was unfamiliar with the official United States Weather Bureau definition of severe turbulence, was also of the opinion that the existence of low-pressure areas and turbulence on a projected flight route was unimportant, and was unaware of respondent's established rule against dispatching flights into areas of known severe turbulence.

7—On the morning of February 13, 1953, a low-pressure area had developed in conjunction with a warm front over northern Mexico and southwest Texas, and had begun an eastward movement over the Gulf. Meanwhile, a high-pressure area was developing over the Texas Panhandle in the form of a deep trough, in warm air at an altitude of 10,000 feet, filling with colder air from a cold front approaching from Montana. By 7:00 AM on February 14, the cold front and high-pressure area had begun moving rapidly down over central Texas, in the direction of the low-pressure area and warm front to the south. The conjunction of the two fronts caused the low-pressure area to develop and intensify.

8—The 10:33-AM regional forecast issued by the United States Weather Bureau at Miami on February 14, in-

dicated that the center of the low-pressure area was in the northwest Gulf, moving rapidly toward northwest Florida. The terminal forecast issued at New Orleans at the same time also showed the low-pressure area in the northwest Gulf, and indicated the presence of "moderate to severe" turbulence in thunderstorms. Respondent received these forecasts promptly over electronic Weather Bureau circuits.

9—Respondent's Flight 917 preceded its Flight 470 by 2½ hours on the Tampa-New Orleans run across the Gulf. Flight 917 left Tampa at 2:11 PM and encountered thickening weather at 3:24 PM. Thereafter, the flight proceeded on instruments through solid clouds. Turbulence was encountered, seat belts were ordered fastened, the "No Smoking" sign was turned on, and all other precautions for turbulent-weather flying were taken. The pilot, Captain Abel, turned over to his co-pilot all supervision of power settings, so that he could keep both hands on the flight controls. Speed was reduced to minimize the effects of the severe turbulence; and terrific head- and cross-winds, and heavy rain and hail were encountered. The plane was buffeted, and pitched, rose and fell sharply in up- and down-drafts. Captain Abel, pilot of Flight 917, testified that he "was able to hold within 1,000 feet of assigned altitude with some difficulty, and it required constant changes on the power to keep airspeed under control. Turbulence was causing the ship to shake and twist around considerably. The rudder at times was forced back and forth without changing the direction of the flight. The instrument panel shook considerably * * * (and) the airplane seemed to jolt and twist from side to side." He stated further that conditions were such that at times the instruments were unreadable, and that it was "a twisting-turning type of turbulence * * * although we did have vertical turbulence at times along with it". Many passengers became ill, all were badly frightened, and many of them prayed. The stewardesses were unable

to leave their seats to aid the passengers in distress. Various objects were thrown about the interior of the plane. It was discovered that although a 12-degree bearing had been allowed for a northerly set, the aircraft had nevertheless been blown miles north of its prescribed course.

10—Flight 917 reached New Orleans at 5:12 PM. Attendants had to assist passengers in disembarking because of the force of the wind. Captain Abel, who described the weather encountered as "some of the worst turbulence he had ever experienced in flights across the Gulf", ordered a structural check of his aircraft.

11—The storm, described above, encountered by respondent's Flight 917 increased in intensity from the time that flight passed through it, until Flight 470 reached the area in the height of the storm, and crashed in the Gulf.

12—Respondent's standing regulations required its flights to make position and weather reports to the Miami Flight-Control office at each of three check points on the Tampa-New Orleans route. Respondent's rules, as well as the Civil Air Regulations (14 CFR 41.113), also required all flights to report all unanticipated weather encountered *en route*, so that such weather could be reported by Flight Control to other flights which might be affected. Further, respondent's rules required all pilots to report severe weather directly to other affected flights. Nevertheless, although Flight 917 was in constant radio contact with respondent, it made no direct report at all to Flight 470 of the extreme weather conditions encountered, and no report thereof whatever until 5:24 PM, after it had landed in New Orleans, and fully two hours after turbulence was first encountered. This report was made only to Miami Flight Control, and was simply a brief message of "extreme turbulence all altitudes just east of New Orleans". At 5:35 PM, another such report was sent to Miami Flight Control, of "severe turbulence No. 1 check to New Orleans". No other reports were made, and no

details of the exceptionally turbulent voyage were ever reported. Further, the reports which were made were never relayed by Flight Control to Flight 470 (then already over the Gulf) until that flight asked for weather advices from Flight 917 at 5:49 PM (23 minutes before the crash), by which time Flight 470 was already surrounded by severe thunderstorms, and effective evasive action was no longer possible.

13—At 4:24 PM, some twenty minutes before Flight 470 left Tampa, respondent's Flight-Control office had requested its radio operator at New Orleans to ask Flight 917 for a weather report, and to pass on to Flight 470 any unusual details. Although the New Orleans operator contacted Flight 917 three times within the next seven minutes, this request was never relayed to the Flight, and accordingly no such information was ever given to Flight 470; and the Miami Flight-Control office made no effort whatever to follow up on the request, or to check on compliance therewith.

14—Flight 470 left Miami for Tampa at 3:15 PM. Its crew consisted of Captain Springer as pilot, Co-Pilot Stettner, a flight engineer and two stewardesses. Captain Springer was an experienced and cautious pilot, who was widely reputed as inclined to avoid turbulent areas. In addition to its crew of five, the plane carried 41 passengers.

15—Co-Pilot Stettner was incompetent in that he was undependable in bad weather, when pilots must keep "two hands on the wheel", and rely on their co-pilots for assistance in handling aircraft controls, making radio contacts and monitoring instruments. Periodic Co-Pilot Progress Reports on the competency of Co-Pilot Stettner, made officially to respondent and maintained by it in its permanent records, describe him as completely incompetent. One such report characterizes him as "dull * * below average in radio technique and knowledge of operation procedures * * in need of special attention * * * not familiar with proper radio procedures * * * (and) no good in instrument weather". A subsequent report states that Stettner "has to be told every radio contact in detail * * * is simply afraid of instrument weather and therefore hurts rather than helps in instrument weather". A final such report, made only some eight months before the crash, describes Stettner as "tense and very nervous while on instruments", and expresses "doubt if his general nervousness and undependability can be improved". At least one of the persons who made these reports was shown to be available at the time of trial. Respondent did not produce him as a witness, nor seek to explain its failure to do so. The court finds the reports to be correct. During prior years, Stettner had been down-graded progressively from first pilot to reserve captain to co-pilot. Respondent's vice-president in charge of operations, on being asked whether he would fly on instruments with a co-pilot of whom such reports had been made, stated simply that "he wouldn't be a qualified co-pilot if he were like that". Respondent's chief pilot conceded that "a co-pilot of that type would not be desirable". Respondent's check pilot Royall at first insisted that respondent had not "ever had such a co-pilot on scheduled operations", but when shown the quoted reports on Co-Pilot Stettner, conceded that they were official, and agreed that "such a co-pilot should not have been sent out on an instrument clearance flight over the Gulf where thunderstorm activity and severe turbulence had been forecast". The court finds that the highest degree of skill, on the part of both pilot and co-pilot, is necessary for safe flying of commercial passenger aircraft in bad weather.

16—Prior to leaving Miami, Captain Springer had reviewed weather conditions with the dispatcher on duty in respondent's Flight-Control office. Rapid barometric falls at Mobile, Pensacola and New Orleans indicated swift approach and intensification of the low-pressure area in the Gulf; but this information,

contained in Weather Bureau reports received hourly by the Flight-Control office, was not given to Captain Springer, a cautious pilot, widely known, as stated, to avoid areas of turbulence. Although respondent's operations manual required that "at stations where meteorological service or dispatch personnel are available, the captain shall consult with them" before taking off, Captain Springer did not consult the Weather Bureau meteorologists at Miami airfield. All Weather Bureau meteorologists on duty at that time, were then of the opinion that the weather situation in the Gulf was deteriorating rapidly and continuously.

17—Flight 470 landed at Tampa at 4:15 PM, completing the first leg of its voyage. It will be recalled that, as noted in finding 13 above, at 4:24 PM, while Flight 470 was still on the ground at Tampa, respondent's Flight-Control office made an abortive effort to obtain a Gulf weather report from Flight 917 for the benefit of Flight 470. At 4:23 PM, while Flight 470 was still on the ground at Tampa, respondent's Flight 11, bound from Mobile to New Orleans, encountered very heavy and severe turbulence near New Orleans and was forced to reverse course immediately and turn back to Mobile. At 4:46 PM, respondent's Flight 19, scheduled westward to New Orleans, cancelled at Pensacola because of worsening weather conditions ahead. At 4:33 PM, while Flight 470 was still on the ground at Tampa, regional forecasts were issued by the United States Weather Bureau offices at Miami and New Orleans. The New Orleans forecast advised of a "wave" or low-pressure area 100 miles southwest of Grand Isle and warned of "turbulence moderate to severe in thunderstorms". The Miami forecast advised of a "rapidly moving wave about 100 miles south of Pensacola * * * (with) a cold front south-southwest from the wave * * * (and) a squall line developing about 200 miles in advance of the cold front * * * numerous thunderstorms * * * briefly severe turbulence in thunderstorms." A "Technical Manual" issued as a "Pilots'

Weather Handbook" by the Civil Aeronautics Administration, states: "A 'squall line' is often characterized by an almost impenetrable wall of turbulent clouds building to 40,000 feet or higher. Squall lines have within themselves some of the most turbulent weather experienced by pilots." The purport of the above forecasts was to place the center of the disturbance directly in the projected flight path of Flight 470. Although the rapidity of the movement of the disturbance to the Pensacola area was unexpected, and although other flights of respondent in the Gulf area were advised at this time that "center of low pressure area in Pensacola area and moving east", Flight 470 was never advised of these forecasts, and was never advised of the reversal of respondent's Flight 11 or of the cancellation of respondent's Flight 19. The court finds that had Captain Springer been advised of these matters, he would either have delayed the Tampa-New Orleans leg of his voyage pending improvement of the weather, or would have taken a southerly route to avoid the dangerous northeast quadrant of the storm, and to avoid cutting across its characteristic northeast track, as he had actually indicated to respondent's dispatcher at Miami he would be inclined to do, if he were advised of development of circumstances warranting such deviation.

18—Flight 470 left Tampa at 4:43 PM. At 5:49 PM, the flight reported by radio that it was surrounded by "thunderstorms all quadrants". This was the first report of bad weather by Flight 470. At the same time (5:49 PM), the flight requested information as to weather conditions encountered by Flight 917. Only then did respondent summarily advise Flight 470 of Flight 917's report (made twenty-five minutes earlier at 5:24 PM) of "severe turbulence at all altitudes" between the third check point and New Orleans.

19—All meteorologists who testified in the case agreed that weather reports from planes and ships on the spot, form the most reliable sources of information

as to weather conditions in the Gulf. The Pilots' Weather Handbook, published as a Technical Manual by the Civil Aeronautics Administration, provides: "No one can tell more about the severity of the turbulence in a thunderstorm * * * than the pilot who has just flown through that condition. That is why the Weather Bureau is anxious to obtain first-hand reports from pilots on the weather conditions as seen from the air. Pilots' reports of the weather are given the widest possible distribution." Respondent's vice-president in charge of operations testified that "it is expected of" pilots, "if they encounter any particularly severe condition, to pass on the information to other pilots." Captain Abel, the pilot of respondent's Flight 917, testified: "I wasn't concerned with any other flight coming across there * * *. That is the responsibility of Flight Control."

20—At 5:50 PM, at least 22 minutes before the crash, respondent's Miami Flight-Control office received a severe-weather bulletin from the Weather Bureau Analysis Center in Washington. Although this bulletin forecast hail, severe thunderstorms and "more severe storms and severe turbulence aloft" in the region then being traversed by Flight 470, the bulletin was never transmitted to that flight, although the Flight-Control office was in radio contact with the flight several times during that interval.

21—Shortly after 5:49 PM, Flight 470 advised that it was reducing power because of turbulence. Five minutes later, it requested permission to descend from 14,000 to 4,500 feet in an effort to get out of the turbulent conditions. Permission was granted at 6:00 PM. At 6:12 PM, the flight advised (its last message) that it had reached 4,500 feet at 6:10 PM. Shortly thereafter it was destroyed by the storm, and all passengers and crew were killed. The location of the plane's wreckage in the Gulf of Mexico off the Alabama coast (approximately 30:10:25 North latitude, 87:57:10 West longitude) showed that it

had been blown some 50 miles north of its scheduled course.

22—The only witness produced by respondent was General Milton Arnold, a former Air-Force officer and a pilot with meteorological experience, now employed by an airline association. General Arnold testified that in his opinion Flight 470 was destroyed by a tornado. Two weather experts of unimpeachable standing testified that the existence of a tornado in the area of the casualty could be considered only a remote possibility. General Arnold conceded that the Weather Bureau's forecasts of severe turbulence issued before Flight 470 left Tampa would encompass the highest degree of turbulence, including the possible presence of tornadoes. Father Eisele, another meteorologist whose testimony in a companion case was offered by respondent in this case, testified that without regard to the presence of tornadoes, the severity of the storm was such as to make it dangerous for a plane to attempt to navigate the area. The court finds that Flight 470 was not destroyed by a tornado; but that, in any event, the storm which destroyed it was of the highest degree of severe turbulence, of which respondent had ample warning, and into which it should not have permitted Flight 470 to enter.

23—The crash of National Airlines Flight 470 in the Gulf of Mexico, off the coast of Alabama, on the evening of February 14, 1953, with the loss of all of its 41 passengers and crew of 5, was caused proximately by respondent's negligence, in the following respects:

a—Placing its pilot weather service in charge of dispatchers untrained in meteorology and incapable of appreciating the aviation significance of turbulent weather conditions, reports and forecasts.

b—Inclusion in the crew of Flight 470, of a co-pilot who, to the knowledge of respondent, was incompetent and could not be relied on to render necessary assistance to the pilot in turbulent weather.

c—Failure of respondent's Miami dispatcher, who gave Captain Springer his pre-flight weather briefing, to advise Captain Springer of the rapid falls in barometric pressure at New Orleans, Mobile and Pensacola which indicated swift approach toward those ports of the low-pressure area in the Gulf, and extreme intensification of the approaching storm.

d—Failure of Flight 917 to advise Flight 470, or respondent's Flight-Control office for the benefit of Flight 470, of the severe weather encountered at the time it was encountered, as required by respondent's own rules and by the Civil Air Regulations; and Flight 917's failure to make a full report of these turbulent weather conditions at any time before Flight 470 was lost.

e—Failure to obtain a weather report from Flight 917 in time to be of benefit to Flight 470, and failure to follow through on the abortive attempt to obtain such a report at 4:24 PM before Flight 470 left Tampa.

f—Failure to advise Flight 470, still on the ground at Tampa, that respondent's Flight 11, bound westward for New Orleans, had had to turn back to Mobile because of unflyable weather.

g—Failure to transmit to Flight 470, still on the ground at Tampa, the 4:33 PM Miami and New Orleans forecasts of severe turbulence directly in the path of that flight's scheduled route.

h—Failure to give to Flight 470, still on the ground at Tampa, the advice given to other flights of respondent in the same region, that the center of the Gulf disturbance was in the "Pensacola area".

i—Failure to advise Flight 470, then only three minutes out of Tampa, that respondent's Flight 19, bound westward for New Orleans, had cancelled at Pensacola because of severe weather ahead.

j—Failure to transmit to Flight 470, Flight 917's eventual severe-turbulence report until Flight 470 itself requested the report 25 minutes later, by which time Flight 470 was already surrounded by severe thunderstorms, and it was too late for effective evasive action.

k—Failure to transmit to Flight 470 the severe-turbulence Weather Bureau report received at 5:50 PM, despite the fact that respondent's ground stations had been in constant direct touch with Flight 470 during the succeeding 22 minutes.

l—Permitting Flight 470 to proceed, unwarned, on a route unsafe for air travel in light of known "severe turbulent" weather conditions.

### Conclusions of Law

1—This Court has jurisdiction of this action.

■ 2—The action lies, and was properly brought, under Chapter 21 of Title 46 of the United States Code Annotated, § 761 et seq. (the Wrongful Death on the High Seas Act).

■ 3—The aircraft used by respondent on its Flight 470 on February 14, 1953, was not airworthy, in that her co-pilot was incompetent within the knowledge and privity of respondent. The Midland Victory, 2 Cir., 178 F.2d 243, 1950 A.M.C. 57; The Ruth Conway, 4 Cir., 171 F.2d 416, 1949 A.M.C. 17; The Denali, 9 Cir., 105 F.2d 413, 1939 A.M.C. 930; 9 Cir., 112 F.2d 952, 1940 A.M.C. 877, certiorari denied Alaska S. S. Co. v. Pacific Coast Coal Co., 311 U. S. 687, 61 S.Ct. 65, 85 L.Ed. 444.

4—The death of libelant Beryl Whiteman Stiles' intestate was caused proximately by respondent's negligence, and libelant is entitled to prove her damages, and to recover them from respondent.

5—The deaths of libelant N. H. Conder's intestates were caused proximately by respondent's negligence, and libelant is entitled to prove his damages, and to recover them from respondent.

6—An interlocutory decree of liability will be entered.