**AMERICAN AIRLINES, INC., Appellant,**

v.

**UNITED STATES of America and Sara Ann Creasy, Appellees.**

**Sara Ann CREASY, Appellant,**

v.

**UNITED STATES of America, Appellee.**

**No. 26185.**

United States Court of Appeals Fifth Circuit.

Sept. 25, 1969.

Rehearing Denied Nov. 17, 1969.

W. B. Patterson, Jack Pew, Jr., Dallas, Tex., for American Airlines, Inc., Frederick B. Lacey, Daniel K. Read, Jr., Shanley & Fisher, Newark, N. J., Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., of counsel.

John H. McElhaney, Dallas, Tex., for Sara Ann Creasy, Speiser, Shumate, Goeghan & Krause, New York City, Turner, Rodgers, Winn, Scurlock & Terry, Dallas, Tex., of counsel.

Eldon B. Mahon, U. S. Atty., Kenneth J. Mighell, Asst. U. S. Atty., Dallas, Tex., William L. Morrow, Leonard Schaitman, Morton Hollander, Attys., U. S. Dept. of Justice, Washington, D. C., J. Carlisle DeHay, Jr., George Gardere, Dallas, Tex., Carl Eardley, Acting Asst. Atty. Gen., Attorneys, Department of Justice, Washington, D. C., for Boeing.

Before COLEMAN and SIMPSON, Circuit Judges, and MEHRTENS, District Judge.

COLEMAN, Circuit Judge:

■ At one minute and thirty-five seconds past seven o'clock [1] on the evening of November 5, 1965, American Airlines Flight 383 crashed while approach-

---

1. All hours referred to in this opinion are P.M., Eastern Standard Time.

ing a landing at the Greater Cincinnati Airport. The aircraft, a Boeing 727, struck the ground at a point which was 225 feet below the elevation of the landing field. Of the sixty-two persons aboard, fifty-eight were killed.

Samuel O. Creasy, age twenty-nine, was one of those who lost his life. His widow, as administratrix of his estate and as next friend to his minor children, sued American Airlines for his wrongful death under the Kentucky statute,[2] alleging that American's negligence caused the crash. American denied negligence and filed a third-party complaint against the United States. Under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2674, alleging negligence on the part of employees of the Federal Aviation Agency and the Weather Bureau, American claimed indemnity and/or contribution from the United States. Mrs. Creasy then filed an amended complaint, also suing the United States. Not to be outdone in the salvo of pleadings, the United States then filed its own third-party complaint against American.

After an eighteen day trial, upon a jury verdict, judgment was entered against American in the sum of $175,-000, plus funeral expenses. The District Judge found the United States not guilty of any negligence which contributed to the crash. American appeals against both Mrs. Creasy and the Government. Mrs. Creasy filed a protective appeal against the Government. We affirm the judgment of the District Court.

The crucial issue on this appeal is whether the findings of the District Court, exonerating the United States, were clearly erroneous, Rule 52(a), Federal Rules of Civil Procedure.

American Airlines sought to shift, or to reduce, its liability by charging the employees of the Federal Aviation Agency and of the Weather Bureau with negligence, wholesale and widespread.

The jury rendered an advisory verdict in favor of the United States on the Tort Claim. The District Judge, who must make the final factual decisions in Tort Claims cases, found that no employee of the United States Weather Bureau or of the Federal Aviation Agency was guilty of any negligent act or omission, in violation of his duties, which constituted a proximate cause of the accident. A thorough sifting of the record reveals no justification for an appellate opinion that this finding was clearly erroneous.

## I *The Facts*

At 5:38 o'clock Flight 383 departed LaGuardia Airport, New York City, nonstop for the Greater Cincinnati Airport, Covington, Kentucky. The estimated flying time was eighty-three minutes. Prior to departure, the crew of Flight 383 obtained from the meteorology department of American Airlines a weather briefing and a forecast of both the weather enroute and the weather at Cincinnati. The forecast *for the Cincinnati area* for the period between 4:00 and 8:00 o'clock was

> "1200 feet broken clouds and 3500 feet overcast above the level of the airport, visibility 4 miles, light rain and fog conditions variable to 1,000 feet overcast, visibility 2 miles, thunderstorm activity with moderate rain showers."

There was expert testimony that such a forecast placed an American Airlines' crew, trained in meteorology, on continual vigilance for thunderstorm activity.

Before leaving LaGuardia, the crew filed an Instrument Flight Rule (IFR) plan.

Captain Weekly, an American Airlines pilot, was riding as a passenger. He survived the crash and testified that during the latter half of the flight the passengers were informed over the public

---

2. Kentucky Revised Statutes, § 411.130. Under Kentucky Law, American Airlines owed its passengers the highest degree of care and to be exonerated had to prove that the crash "could not have been pre-

vented it by the exercise of the utmost skill and foresight", Adams v. Louisville Taxicab and Transfer Company, 307 Ky. 405, 211 S.W.2d 397 (1948).

address system from the cockpit that Flight 383 was being rerouted to circumnavigate weather—that is, to avoid thunderstorms.

Captain Teelin, who had 225 hours of line flying in a Boeing 727, was in charge of the flight. He, however, was acting both as co-pilot and as check-airman for Captain O'Neill, who was at the controls. Captain O'Neill had received his Boeing 727 rating only eighteen days previously and had only 11½ hours of line flying time in a 727. He had flown a 727 into the Cincinnati Airport one time previously, during the day time. There was evidence that at least one time during his 727 qualification training he experienced difficulty executing "missed approach" technique, that is, the handling of the aircraft upon inability to complete a landing as previously authorized.

The Greater Cincinnati Airport is situated several miles south of the Ohio River. It has a field elevation of 890 feet above mean sea level. The crash occurred as Flight 383 was making an approach to land on Runway 18, which runs from north to south, and required an approach from the north because of prevailing wind conditions. Flying in a northerly direction, on its "downwind leg", approximately four miles to the east of and parallel with Runway 18, the flight approached the airport from the southeast. It then flew across the Ohio River and turned in a generally westerly direction on its base leg. At a point where the Ohio River turns northwesterly, the flight recrossed the river into Kentucky and initiated another left turn into its "final leg" for a landing onto the north end of Runway 18. This turn, however, was never completed, for Flight 383 crashed into the tree-covered upslope of a hill on the south side of the river at an altitude of 665 feet above mean sea level, *or 225 feet below the elevation of the runway*. The wreckage was found approximately two miles north of the approach end of Runway 18, and approximately one quarter of a mile east of the runway center line as extended.

At 6:55:45 o'clock, Flight 383 made its first contact with the Federal Aviation Approach Control facility at Cincinnati. It was informed that an ILS (Instrument Landing System) approach to Runway 18 was available. At 6:57:46, the flight advised Approach Control that it had the airport in sight and requested "a control VFR". There is no such term in either government or airline manuals, but Control understood, no doubt correctly, that a visual approach was requested. The Approach Controller, Mr. Hyder, granted a visual approach clearance, which the flight crew accepted. Hyder notified 383 that there was precipitation lying just to the west boundary of the airport and that it was south bound. Visibility was seven miles, well above the prescribed three mile minimum for a visual approach.

At 6:58:14, the Local Controller, Mr. Reincke, was informed by Hyder (by inter-com) of the position of Flight 383 and of the clearance for a visual approach. Mr. Reincke occupied a position in the airport tower cab approximately *2000 feet east of Runway 18*, which permitted him to see approaching aircraft.

At 6:58:50, Flight 383, then six miles southeast of the airport, was directed to switch to the radio frequency of the Local Controller. At 6:59:07, Flight 383 contacted Local Control. At that moment, however, Mr. Reincke was engaged in following another approaching aircraft, an Aero-Commander, identified by the numbers "N 11L".

At 6:59:26, approximately two minutes and nine seconds prior to the fatal crash, Local Control informed Flight 383 that it was "in sight" and cleared to land on Runway 18.

Beginning with 6:59:20, we now quote verbatim the communications exchanged between the tower and the ill-fated flight. American Airlines 383 will be referred to as AA 383. The Local Controller will be referred to as LC. The

Approach Controller will be referred to as AC.

"6:59:20

AA 383. How far west is that precipitation line now?

6:59:21

LC. Looks like its just about over the field at this time, sir, we're not getting any on the field, however.

(As previously stated, Local Control was speaking from a point 2000 feet east of Runway 18).

6:59:26

AA 383. Okay.

6:59:30

LC. If we have a windshift I'll keep you advised as you turn onto final.

6:59:34

AA 383. Thank you very much, we'd appreciate it.

6:59:56

LC. American three eighty three we are beginning to pick up a little rain now.

7:00:00

AA 383. Okay.

7:00:14

AC to LC. (Intercom) How's American look out there?

7:00:18

LC to AC. I don't think he's going to make it.[3] How about one lima (N 11L) at Mt. Healthy? How's he going to make out?

7:00:22

AC to LC. He's fine; he's nine north northeast.

7:00:26

LC to AC. No, I mean as far as this precip; we are starting to pick up the rain now; it's starting to rain now.

7:00:30

AC to LC. It's right—should be right over you Bill.

7:00:34

LC to AC. Okay.

7:00:38

AC to LC. Bill, if we get a windshift I have an American (another American Airlines flight approaching from the south) out here just by Grantslick. I might run him for thirty-six with a fast shuffle.

7:00:43

LC to AC. Okay.

AC to LC. If not, I might bring him around the east, correction, on the east side for two seven.

7:00:48

LC. One one lima (N 11L) suggest you come up to approach control for vectors into the field, the rain has just hit, our visibility is decreasing.

7:00:53

N 11L. Roger.

7:00:59

LC. American three eighty three you still got the runway okay?

7:01:02

AA 383. Ah, just barely we'll ah pick up the ILS here.

7:01:07

LC. American three eighty three approach lights, flashers and runway lights are all high intensity.

7:01:10

---

3. Local Controller Reincke testified that by this statement he simply meant that Flight 383 could not make it on a visual approach and would have to switch to IFR.

AA 383. Okay

[This was twenty-five seconds before the crash and was the last radio contact with Flight 383].

7:01:18

LC to AC. Our vis (visibility) north just went to nothing, one one lima is coming to you.

7:01:28

LC. Wind check two seven zero degrees six. (270°, six miles per hour).

7:02:03

[28 seconds after crash]

LC to AC. I don't know where three eighty three is.

This is the fatal story of fifty-eight human beings and a mighty aircraft—as late as thirty-three seconds before the crash apparently unaware of impending doom.

Captain Elmer C. Weekly, one of the survivors, had been an employee of American since July 16, 1951. He was qualified to fly Boeing 727 aircraft. He had 14,000 hours of flying time in various types of airplanes. That same day he had flown co-pilot on a 727 from Chicago to LaGuardia. On the fatal flight he occupied the most forward seat on the right hand side of the passenger cabin. He testified by deposition:

"Q. In what capacity was Captain O'Neill aboard the 727?

A. As a trainee."

He further testified that he noticed no turbulence during the flight, down to the time of impact. He thought descent into Cincinnati was rather rapid and after initial descent he could see the lights of the city. From his position in the aircraft he saw no clouds except for wisps or mist. He remembered seeing lights on the ground which he believed were only 100 to 200 feet below the aircraft. Prior to the crash he saw only one or two light streaks of moisture on the window pane. After he had escaped from the burning, exploding plane it rained quite heavily for from three to five minutes.

Another witness, Miss Mary Fagan, occupied a vantage point about one quarter of a mile north of the Ohio. She said Flight 383 lost altitude as it approached the river and seemed to descend below the level of the hills on the Kentucky side. She saw no lighting near the aircraft.

Another witness, Ralph Sprague, visually followed the flight from his home, which was located about one quarter mile from the crash site. It was his belief, from what he saw, that the plane was off course, had descended "too low" in the river valley, and was trying to gain altitude when it crashed.[4]

John A. Kuhn was the pilot of the previously mentioned Aero-Commander, N 11L. He took off from Hamilton, Ohio, around 6:40–6:45, and headed for Cincinnati. At the Mt. Healthy ommi checkpoint, seventeen miles from the Cincinnati Airport, the weather was clear, visibility was good, and Kuhn could distinguish the Cincinnati Airport. After he called Cincinnati Airport, being on the same radio frequency, he overheard the following transmission from American 383: "Cincinnati Tower, American 383, air six southeast and ask control VFR". After this the witness observed a light below his altitude and then a fire. The fire was directly off the end of the runway about half-way between the river and the airport. When the witness saw the fire there was a rain shower west and southwest of the Cincinnati Airport. The only clouds the witness saw were scud type clouds over the river.

There was abundant testimony that when Flight 383 reached the vicinity of the airport there was lightning in the northwest. Retired Captain Guthrie,

4. Mr. Sprague's testimony (by deposition) that at the time of the crash heavy rain was falling at his home, a quarter of a mile from the crash scene, will be discussed at a later point.

expert witness for American, testified that anyone flying a plane at night can certainly see the lightning in a thunderstorm. Additionally, Flight 383 was equipped with airborne radar, specifically designed for weather avoidance, and it was undisputed that this equipment could effectively be used to within thirty miles of the airport, although ground interference at low altitude might have been a problem. Captain Burton, Director of Flight Instructions for American Airlines, testified that airborne radar could have given a fair depiction of weather even when Flight 383 was upon its downwind leg.

Air Controller Davidson, who was not on duty, entered the tower cab on November 5 at approximately 6:55 o'clock. He first observed the aircraft at an altitude of 1600 feet above the ground, four miles from the field.

The "Flight Recorder"[5] on board the aircraft was recovered. An examination by National Safety Board experts demonstrated that when Flight 383 turned on its final leg for a landing it was fifteen feet below the field level of the airport. Both Captain Preston, who trains American Airlines pilots to fly the Boeing 727, and Captain Burton testified that an American Airlines aircraft should have an altitude of not less than 500 feet above the ground before embarking upon the final leg of its approach for a landing.

Examination of the flight recorder further revealed that from 83:04 to 83:-14 (the last ten seconds of the flight) the altitude drop was at the rate of 2,-000 feet per minute. This is "indicated" speed rather than actual speed, but the difference is not enough to distort the data.

Post accident checks revealed that the radar was working normally within all measurable tolerances. A Federal Aviation Agency aircraft made a flight check on the VOR (Visual Ommi Range) landing on Runway 18 and pronounced the system sound. The ILS was functioning properly, as were the approach lights. The nondirectional radio beacon was functioning. The two radio frequencies that were checked were found to be operating within tolerances.

The American Airlines operations agent at the airport, Mr. Jack Diamond, testified that the two radio transmitters in his office had a range of fifty miles and were fixed on two specific frequencies. Flight 383 called at 6:45 and received altimeter, barometric pressure, and temperature readings. The weather was not mentioned and, so far as this witness knew, no one at the operations office transmitted any message to the flight after 6:45. At 6:58, the TelAutograph, situated within three feet of Mr. Diamond, reported the weather as: "Measured ceiling is 1500 feet broken, 4,000 overcast, the visibility is seven miles with a thunderstorm. The wind 220 degrees at 8 knots, the altimeter is an even 30 inches. There is a thunderstorm moving southeast, occasional lightning in the clouds and cloud to cloud." Mr. Diamond did not relay this information to Flight 383 because it was "on approach". The flight never at any time requested or received any weather information from its flight operations office. Mr. Diamond conceded that the American Flight Manual required their operations offices to inform aircraft in flight of all reported weather conditions which, in their opinion, might affect the safety of the flights.

We pause to note that the 6:58 report was better than the one received upon departure from New York in that ceilings and visibility had substantially improved. There was a thunderstorm, but this had been included in the New York forecast.

The eye witness on the ground nearest to the crash scene was Mr. Ralph Sprague. He lived a quarter of a mile to the west of the crash site and did not go to the scene for some twenty or thirty minutes afterwards because he, naturally, was in fear of an explosion. He had

5. The flight recorder records time, vertical acceleration, heading, air speed, and altitude.

been to the grocery. He saw the plane immediately upon his return home in his automobile. He testified, "When I first looked up and saw these lights I thought he was right down in the trees, and he was to the east. * * * I yelled to my wife, I said, 'My God, that plane is crashing'. I thought he was already in the trees; and when it was all over and I saw where he had hit, he was farther away than we thought he was. * * * His flood lights were on. * * * I think he went up, and I still think he went up before the final impact". Mr. Sprague testified that it had rained all the way from the grocery store "Yes it was pouring down. * * * No, I didn't notice any sudden winds or anything. Just hard rain. * * * When you are there every day and see the approach, he was away off course and he got down in that valley and didn't know that hill was in front of him. * * * The majority of the planes fly directly over my home from the Ohio River".

It is to be noted that the rain was moving from northwest to southeast and Mr. Sprague was situated a quarter of a mile west of the crash site. Captain Weekly noticed only small wisps of moisture prior to the crash but said there was a "deluge" for a few minutes immediately after he escaped from the aircraft.

Mrs. Delores Elsaesser lived one mile north of the Ohio River. She noticed it was raining, knew that it had been lightning, but did not recall any thunder. She thought when the plane came over her home "It just seemed low to me. It just looked low. It was not a blowing rain."

Mr. Matthew J. Hartman lived about a quarter of a mile north of the Ohio River. He saw the plane flying from east to west. He said there was strong wind blowing. As to the course of the flight, "[I]t wasn't the normal course that any other plane took across." He thought that it had rained an hour or two after the accident. [Captain Weekly said that it rained for only a few minutes at the crash site]. It appeared to him that the power on the plane was cut back, "just coasting along without trying to rev up the motors." He thought the plane was unreasonably low or dangerously low because "all the other ones that come over are farther north, but go way down farther before they make that turn. They seem to be quite a bit higher." At another point he said, "I wouldn't say there was a strong wind. There was a slight wind. Normally, about eight, ten miles an hour, I guess, or something like that." He noticed no sudden change in the wind, but was not paying it that much attention. He saw lightning, but would not say that it was near the airplane. At another point he said, "The wind was gusty but the plane looked like it was holding steady."

John Richard Sherada, known as Brother Cyril, a Novitiate at the Mt. Alverno School, on the north side of the Ohio, in sight of the river, was standing in the open waiting to be picked up for a ride to night class. He testified "No, it wasn't raining enough to make us go inside. It might be a slight drizzle but we liked to wait outside. It did start raining immediately after the plane crashed and that forced us to go inside." He said the plane had on its bright headlights. He thought they were the landing lights, the bright ones that throw a long beam.

We attach no evidentiary significance to the testimony of Mrs. Katherine Mary Tabar since she was unable to connect a plane which she saw and described with the one actually involved in the crash.

■ The Boeing 727 in use by Flight 383 carried three separate altimeters, all mounted on the same panel. Before the descent to land, altimeters numbered 1 and 2 are set to indicate the altitude of the aircraft above the airport. Number 3 is set to show altitude above mean sea level. Since the altitude of the Cincinnati Airport is 890 feet above mean sea level it necessarily follows that if the plane were on the runway altimeter Number 3 would show an elevation of 890 feet,

while the other two would be measuring 0. The plane crashed at 225 feet below the level of the runway. Altimeter 3 would at that time be reading 665. Captain David Teelin was seated in the right hand seat in the cockpit. It was his duty to monitor the altimeters on the landing approach while, at the same time noting the performance of the "transition" pilot at the controls. It was also Teelin's duty to keep the airport in sight. Since American concedes that there was no malfunction in the aircraft and admits of no deficiency in the training and experience of the crew, and since it is inconceivable that any pilot would knowingly permit his aircraft to descend to a point 225 feet below the known elevation of the runway, an issue was presented from which the jury could draw reasonable inferences as to whether in the midst of the many duties devolving on the pilots at the time Captain Teelin simply read the wrong altimeter and thus caused the crash.

The lengthy expert testimony of Captain Edward Preston, Captain Melvin R. Burton and Retired Captain W. C. Guthrie must be reduced to material elements. Captain Preston trains pilots for American Airlines and had 100 hours of line flying in a 727 but had not flown into Cincinnati on that aircraft. He had done so in other types. Captain Burton was the first American pilot to qualify in a 727. Captain Guthrie had 888 hours in a 727. From the testimony of these three trained and experienced 727 pilots the Judge and the jury had ample testimony upon which to find or infer the facts hereinafter recited.

Approach Control is in charge of incoming flights above two thousand feet, out to a distance of thirty miles. Local Control is in charge within five miles and ground altitude below two thousand feet.

It is the pilot's responsibility as to whether he will land under visual flight rules or instrument flight rules, although the controller must approve the choice. When the controller clears a pilot for visual approach he is not certifying that conditions will not change but he is say-ing that ground visibility then meets the minimums for the method selected. Of course, in the exercise of due care he should not grant the clearance if he has sound reason to anticipate a change which would eliminate the necessary minimums.

Airborne radar above an altitude of 2135 feet from the ground would pick up thunderstorms as far away as thirty miles. Ground clutter is often encountered by radar below altitude 2135.

When Flight 383 acknowledged information from the tower that there was a line of precipitation to the west of the airport and southbound it was up to the crew to maintain three miles visibility. If this could not be done, the pilot in charge of the flight had three alternatives: (1) request clearance for different approach; (2) terminate the visual approach; (3) descend to a ground altitude no lower than 500 feet to ascertain if he could get under the clouds.

The term "Control VFR" did not appear in the American Airlines manual as of November 8, 1965. In any event, this was a visual approach. A missed approach is one in which the pilot arrives at minimum safe altitude and still cannot reach the airport. He then climbs to an altitude and a heading assigned by Approach Control and awaits further instructions. Whatever the approach, whether visually or on instruments, if a pilot encounters visibility below the prescribed minimums it is his duty to execute a missed approach. Moreover, a missed approach is indicated if visibility is deteriorating. FAA regulations prohibit flying VFR near an airport (in the controlled area) at any point which is five hundred feet below, one thousand feet above, or two thousand feet horizontally from cloud formations.

According to Federal Aviation Agency VFR regulations there must be three mile horizontal visibility in a control zone and the aircraft must be clear of clouds. If these conditions are absent the pilot should immediately request IFR clearance.

It is inconsistent with American Airlines policy of safety first to fly below 500 feet when the pilot cannot maintain visual reference to the ground.

American Airlines pilots are expected to use the ILS glide slope where available. In order to make full use of the ILS it must be intercepted *at or outside* the "outer marker". In the instant case, the outer marker is north of the Ohio River. The pattern flown by Flight 383 was not out far enough to intercept ILS. The Boeing 727 is equipped with an IFR glide slope indicator which indicates by an arrow whether the flight is above or below the proper trajectory for an IFR approach. There is also an instrument known as a localizer which when set on runway heading (in this case 180°) will indicate deviations from the proper approach. There is a vertical speed indicator which informs the pilot of his rate of ascent or descent per minute, to within 100 feet of accuracy.

At two or three miles from the runway the aircraft should have been approximately 500–1000 feet high. "In the slot" position occurs when the aircraft is 250 feet above the ground and three-fourths of a mile out.

American pilots are trained in a mock-up cabin to adjust from visual to instrument reference and vice versa. A co-pilot is not required to have an A type rating in the aircraft he flies. When the flaps of a 727 type aircraft are moved from twenty-five to thirty degrees the aircraft tends to pitch nose down.

It was inconsistent with safe operation to continue to descend from 1,000 feet while flying the base leg. In other words, upon beginning final approach the altitude should have been at least a thousand feet. The speed of 153 Knots would make it quite difficult to slow the plane down, continue the flap sequence, and complete the check list. The only way to decelerate a jet in a rapid descent is to leave flaps on, cut the power, and pull the nose up. Pulling up the nose, however, can actually increase the rate of descent.

Under the circumstances of Flight 383 the most conservative approach would have been an instrument landing. The altitude of the glide slope at two miles, where the plane crashed, was 540 feet. In the weather conditions forecast for Cincinatti the proper precaution would have been to maintain high altitude. An indicated speed of 213 Knots within the five mile controlled zone exceeds Federal Aviation Agency regulations. After the announcement that the pilot would pick up ILS, it was unsafe for him to descend.

Only *momentary loss of view* of the airport is allowed under VFR conditions. Captain Guthrie testified that he would not make a visual approach in any precipitation at night.

When a pilot flying on IFR from city to city requests a visual approach into an airport he doesn't cancel his IFR. It is the pilot's duty to keep the VFR minimums that go with making a visual approach.

Using the weather information at hand, i. e., that the rain was west of the airport and moving south, it was not, in the opinion of Captain Preston, a violation of American's conservative landing practices, to land on visual reference.

Captain Preston trained Captain O'Neill in missed approach procedures one month before the crash. On his Federal Aviation Agency rating ride Captain O'Neill's missed approach procedure was marked unsatisfactory because it was directly related to the approach procedure immediately preceding it. Afterward Captain O'Neill was given fifty-five minutes additional training. Then, to complete training in a 727, pilots are required to ride for twenty-five hours in line operation under the supervision of a check airman (in this case, Captain Teelin).

Captains can, under the American Flight Manual, allow the First Officer to make landings and takeoffs, consistent with the First Officer's experience and weather conditions.

Captain O'Neill's training was transition training (from one type of air-

craft to another) because he was already a captain. On the second test ride with Mr. Zarzychke of the Federal Aviation Agency, Captain O'Neill was rated "Excellent".

### III *The Law*

#### A. The Claim Against the Government

American Airlines never at any point made any motions for a directed verdict against Mrs. Creasy or for a judgment notwithstanding the verdict. It contends only that the judgment in her favor was vitiated by errors in the charge and the conduct of the trial. It was for this reason that we stated at the outset that the most crucial aspect of the litigation is American's claim against the government. We consider this first.

The Federal Tort Claims Act provides, in relevant part, 28 U.S.C.A. § 1346(b):

"(b) Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, * * * for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant *in accordance with the law of the place where the act or omission occurred."* (emphasis added).

American describes its claim as follows:

"The United States, through its employees in the Federal Aviation Agency and the Weather Bureau was charged with negligence in failing to transmit adequate weather information, and in granting and failing to revoke permission for Flight 383 to make a visual approach."

American levels an intensive attack against the findings and conclusions of the trial court, rendered pursuant to 28 U.S.C.A. § 1346(b), 2402.

Specifically, the District Judge found that the employees of FAA were not negligent in authorizing Flight 383 to make a visual approach or negligent in the transmission of weather information to the flight. FAA employees were exonerated of "any act of negligence or of the negligent omission of any act with regard to American Airlines Flight 383 in its approach to Cincinatti Airport". Finally, the agents and employees of the United States Weather Bureau were found to be free of negligence.

American says that Rule 52(a) of the Federal Rules of Civil Procedure does not apply when findings of fact are induced by erroneous views of the law or to mixed findings of fact and law when there is error as to the law, citing Mitchell v. Mitchell Truck Line, Inc., 5 Cir., 1961, 286 F.2d 721, 723; Galena Oaks Corporation v. Scofield, 5 Cir., 1954, 218 F.2d 217, 219. The crucial point in the argument is that the findings were based upon misconceptions about the respective duties of controllers and aircraft pilots. More pointedly it is asserted that the judgment cannot be affirmed unless this Court takes the law to be that the controller is only an air traffic policeman and need not volunteer any weather information beyond that specified in the government manuals.

In a similar suit involving alleged negligence on the part of air traffic controllers at Meachem Field in Fort Worth, we had occasion in 1960 to clearly define some of the basic controlling principles, United States v. Schultetus, 277 F.2d 322, 86 A.L.R.2d 375, cert. denied, 364 U.S. 828, 81 S.Ct. 67, 5 L.Ed.2d 56.

■ First, it was held that liability growing out of the operation of aircraft is to be determined by the ordinary rules of negligence and due care. Secondly, we repeatedly emphasizd that "the direct and primary responsibility for the operation of aircraft * * * rests upon the pilots of the aircraft". We pointed out at another place in the opinion, 277 F.2d at

326, that "The pilot in command of the aircraft shall be directly responsible for its operation and shall have final authority as to operation of the aircraft".

In 1968 we decided the case of Hartz v. United States, 387 F.2d 870. In that case the controller warned a Bonanza about to take off on a runway immediately behind a departing DC-7, "Watch the prop wash". The manual required that he should have said, "Caution, Turbulence, DC-7" or words to that effect. The Bonanza crashed from wing tip vortex turbulence, which was established by testimony to be more severe than prop wash. We held that the Bonanza pilot had not been adequately warned, i. e., the warning was neither sufficient under the manual nor adequate to caution of possible danger then known to the controller. Moreover, the controller had an additional duty to delay take-off clearance for the Bonanza for such period as was reasonably necessary to permit the dissipation of turbulence from the DC-7.

We affirmed the rule that a pilot retains primary responsibility for the movement of his aircraft, citing Schulte-tus, supra, and further held, "Nonetheless, before a pilot can be held legally responsible for the movement of his aircraft he must know, or be held to have known, those facts which were then material to the safe operation of his aircraft".

We expressed our approval of the language in Ingham v. Eastern Air Lines, Inc., 2 Cir., 1967, 373 F.2d 227

"[W]hen the government undertakes to perform services, which in the absence of specific legislation would not be required, it will, nevertheless, be liable if these activities are performed negligently."

Ingham, supra, was a case in which a commercial airliner DC 7 B crashed at Idlewild while attempting to land in a "swirling ground fog". The airline was sued for failure of the flight crew to exercise due care in the operation of the aircraft. The government was sued under the Federal Tort Claims Act on the claim that poor visibility was a factor in the crash and that a substantial, contributing, concurrent cause of the accident was the negligence of the air traffic controllers and the Weather Bureau observer in failing to provide accurate and up-to-date weather information [a critical change in visibility while the plane was attempting an IFR landing]. Sitting without a jury, the district court found and held all defendants guilty of concurring negligence and that neither defendant as a joint tort feasor in pari delicto was entitled to indemnity from the other.

The Second Circuit made short work of the liability of the airline. The flight crew had advance notice of adverse weather conditions. Using the ILS, the plane made its initial impact 348 feet from the extreme left side of the runway. The Court held that the aircraft should not have continued its approach despite an improper alignment with the runway (horizontal rather than vertical). Moreover, the missed approach maneuver was performed in an improper manner. The Airline's defense was that the flight had been struck by a great gull, which distracted the attention of the crew just long enough to cause the accident. The trial court rejected this theory and the Second Circuit affirmed. In Ingham the weatherman at 9:32:49 notified the controller that visibility had diminished to three-quarters of a mile. At 9:33:57, more than a minute after the announcement, the controller advised the flight crew that visibility remained at one mile. The trial judge held that this failed to comply with § 265.2 of the FAA Air Traffic Control Procedures Manual and was a proximate cause of the accident.

Incidentally, a licensed aircraft pilot riding passenger, survived the crash and testified. The Court stated "Such eyewitness evidence, usually lacking in airplane crash cases, is especially valuable in determining whether the crew performed in a negligent manner".

The following standards of duty are to be deduced from *Schultetus, Hartz* and *Ingham*:

1. The pilot is in command of the aircraft, is directly responsible for its operation, and has final authority as to its operation.

2. Before a pilot can be held legally responsible for the movement of his aircraft he must know or be held to have known, those facts which were then material to its safe operation. Certainly the pilot is charged with that knowledge which in the exercise of the highest degree of care he should have known.

3. The air traffic controller must give the warnings specified by the manuals.

4. The air traffic controller, whether or not required by the manuals, must warn of dangers reasonably apparent to him but not apparent, in the exercise of due care, to the pilot.

5. Determined by the facts of the particular case, due care may require an air traffic controller, over and beyond the requirements of the manuals, to delay clearance for a take-off or a landing. If, however, a clearance is duly granted the operation of the aircraft is the sole responsibility of the pilot, with which the air traffic controller is not to interfere except as specifically required by the FAA Air Traffic Control Manuals.

It may well be pointed out that *Schultetus* dealt with a mid-air collision over an airfield; *Hartz* involved an airplane attempting to take off, and *Ingham* involved an aircraft which landed on the airfield but not on the runway. The case now before us, of course, is concerned with a crash caused by a failure to maintain sufficient altitude as the plane was completing its approach base leg at a point two miles from the end of the runway.

Under the law of Kentucky actionable negligence consists of a duty, a violation thereof, and consequent injury. The absence of any one of these elements is fatal to the claim, Illinois Central Railroad v. Vincent, 412 S.W.2d 874 (Ky., 1967).

We need not repeat here the standards so firmly established in this Circuit for the application of the clearly erroneous rule, Chaney v. City of Galveston, 5 Cir., 1966, 368 F.2d 774.

We now apply the law to the facts.

It is not disputed that Flight 383, with no malfunction of aircraft or equipment, was allowed at a distance of two miles from the runway to descend 225 feet below the elevation of the point upon which it proposed to land. It necessarily follows that with properly functioning altimeters aboard, and in the absence of some external force beyond pilot control not reasonably foreseeable in the exercise of the highest degree of care, permitting this aircraft to descend to such an altitude was the sole proximate cause of the crash.

This leaves only two inquiries:

1. Did such an external force cause the crash?

2. Did any negligent act or omission of the aircraft controllers at the Greater Cincinnati Airport mislead the pilots, adversely affecting their ability in the exercise of the highest degree of care to have foreseen the possibility of such a force?

The jury gave a negative response to both questions. We are completely convinced that there exists not the slightest justification for an appellate finding that these responses were clearly erroneous, Chaney v. City of Galveston, supra.

American describes its external force defense as follows:

"[W]hile descending, the plane was caught in downdrafts associated with the storm in which its pilots had flown

unawares, and was swept down to an altitude in the Ohio River Valley from which it could not recover.

"When Flight 383 crashed in the river valley it was endangered by a disturbed air mass, impairing accurate use of its altimeters and by rain and clouds which crossed into its path, causing a sudden reduction in visibility."

There is no suggestion in this record that competent commercial airline pilots in a Boeing Jet 727 cannot maintain altitude in clouds and rain. Visibility cannot have been a causative factor in a crash two miles from the end of the runway, at the completion of the base leg, where the pilots should have been maintaining an altitude of five hundred, preferably one thousand, feet above the runway. This was not a crash on the airfield, as in Ingham, supra. These pilots were qualified for instrument flight and there is nothing to suggest that outside visibility affects the ability of a pilot to read his altimeter in a lighted cockpit.

The whole matter is reduced to the presence or absence of a downdraft, an external force beyond the control of pilot skill and aircraft power, unforeseeable by the exercise of the highest degree of care.

█ The downdraft theory was primarily supported by a private pilot, who was also a meteorologist. It was controverted by the testimony of another highly trained expert. This witness conducted a study of the wind at three measured points near the Cincinnati airport, and concluded that there was "no evidence to suggest strong or unusual vertical wind shear". Obviously, it was within the province of the jury to decide which expert witness should be credited, Dufrene v. Indemnity Insurance Company of North America, 5 Cir., 1962, 303 F.2d 788, cert. denied, 371 U.S. 868, 83 S.Ct. 131, 9 L.Ed.2d 105.

Moreover, the proof is not restricted to the opinions of expert witnesses. Captain Weekly, an experienced commercial airline pilot was aboard—the kind of witness the Second Circuit, in Ingham, denominated "especially valuable". He noted no turbulence, right down to point of impact, nor did he observe any sudden plunge in altitude. Neither did he notice appreciable rain prior to impact. Mr. Sprague, the nearest eyewitness on the ground, noted heavy rain at his location but no wind of any significance.

█ The verdict of the jury rejecting the downdraft theory may not be disturbed.

The ultimate and inescapable result is that pilot error, repeatedly committed, was the sole proximate cause of this tragic commercial airline accident.

Logically, this eliminates any negligence of the air traffic controllers as a proximate cause of the crash. The contention to the contrary has been pushed with such great fervor and unexcelled skill by legal and scientific counsel for American Airlines that we briefly state our views.

Over a period of three months we have carefully digested the thousands of pages of testimony and exhibits introduced in evidence as to the allegedly negligent acts and omissions of the Weather Bureau and the Control Tower. Any extended résumé of that great mass of proof, almost altogether of a highly technical nature, would more properly belong to professional journals of aviation and meteorology. The very volume of this evidence constituted a major contribution to the length of the trial and the almost unprecedented length of the appellate record. Beyond what has already been set forth, we consider it both unnecessary and inappropriate to burden this opinion with a detailed reiteration of the sifting to which this evidence has been subjected in an effort to detect any possible basis for stamping the clearly erroneous brand on the findings of the District Court. No reasonable basis could be found.

The pilots knew before they left New York that thunderstorms were in the forecast for the Cincinnati area. When

the flight arrived in the control area, lightning was plainly visible. The pilots were told of the line of precipitation in the immediate vicinity of the airport. They were later informed that it was right over the airport. Still later they were told that light rain was falling 2,000 feet east of the runway. They acknowledged still later that they had the airport only barely in sight. At this point, if no sooner, being too low to pick up the ILS glide slope, they should have executed a missed approach.

We attach no significance whatever to the momentary drop [at 7:01:18] in visibility on the runway itself from seven miles to two miles and immediately back up again. In no event could this have had anything to do with a descent two miles away to an elevation 225 feet below the runway. Accordingly we abstain from any discussion of the extensively contested issue concerning erasures or corrections of Weather Bureau records with reference to the sudden, momentary visibility drop.

 The decisive consideration is that the trial judge and jury had substantial reasons to believe that nothing transmitted or omitted by Approach Control or by Local Control could have possibly caused the aircraft to descend to an altitude so low as to make this crash inevitable.

### B. Mrs. Creasy's Claim Against American Airlines

American Airlines makes no contention that the proof was insufficient to show that the crash was caused by a breach of American's duty to its passengers. It says the verdict and judgment were vitiated by error in the charge and in the conduct of the trial; therefore, the judgment should be reversed and the case between Mrs. Creasy and American should be remanded for a new trial. We do not agree.

 The Court, of course, is well aware of the teachings of Wilmington Star Mining Company v. Fulton, 205 U.S. 60, 27 S.Ct. 412, 51 L.Ed. 708 (1907), that a verdict which could have been rejected on counts for which there was no evidence cannot stand if it is impossible to say upon which counts the verdict was based. We elaborated upon this doctrine in our recent decision, Lyle v. Bentley, 406 F.2d 325 (1969). The District Court instructed the jury that it might return a verdict for the plaintiff if it found by a preponderance of the evidence that American was guilty of negligence proximately causing the crash in any one or more of thirty-one particulars. We do not prolong this opinion by reciting the thirty-one elements so submitted. Subsequent to the detailed exposition of the facts herein already recited we likewise refrain from a detailed analysis of American's argument as to the elements which it says were without substantial support in the evidence. We think it is sufficient to say that each and every one of the elements was supported by substantial evidence in the record, except one. This was Particular Number 3, "in using the terminology 'control VFR' when communicating with the government radio facilities". While the evidence is undisputed that no such term appears in either the American or FAA operating manuals, and its use was accordingly inaccurate, it is equally correct that the term was meant and understood to mean a visual approach. Therefore, its inaccurate use could not have possibly contributed to the cause of this crash. Even so, it is equally inconceivable that in the mass of testimony so clearly establishing negligence in thirty other particulars this issue could have influenced the verdict against American and we find no justification for reversal and a new trial on such insubstantial grounds, Rule 61, Federal Rules of Civil Procedure.

It is next argued that the admission into evidence of a Civil Aeronautics Board report was reversible error. This assignment is based upon the provisions of 49 U.S.C.A. § 1441(e) that "no part of any report or reports of the Board relating to any accident or the investigation thereof, shall be admitted as evi-

dence or used in any suit or action for damages growing out of any matter mentioned in such report or reports."

One of the challenged exhibits was a graph plotting the "indicated" altitude of Flight 383, and the other was a document explaining the read-out from the flight recorder of the doomed aircraft. Both documents emanated from a government appointed safety committee, headed by Mr. O. E. Patton of the Civil Aeronautics Board.

■■■■ American Airlines' position on the reach of § 1441(e) seems thoroughly at variance with the prevailing interpretation of the statute. As stated in Berguido v. Eastern Air Lines, Inc., 3 Cir., 1963, 317 F.2d 628, 632, "the primary thrust of the provision is to exclude CAB reports which express agency views as to the probable cause of the accident". Exhibits 58 and 89 are not the report of the C.A.B. and do not reflect the Board's evaluation of the data they contain or the emphasis placed on that data in reaching a decision on probable cause. To the contrary the exhibits merely display and explain the data derived from the flight recorder foil itself, which was admitted without objection.

■■■■ Appellant vigorously stresses the opinion nature of the testimony. However, *Berguido* established that qualified testimony going beyond merely personal observations is admissible provided such testimony does not presume to be official agency opinion. Although purporting to follow *Berguido,* Fidelity and Casualty Company of New York v. Frank, 227 F.Supp. 948 (D.Conn., 1964) distinguishes between "factual" testimony by investigators and "evaluation, opinion, or conclusion evidence" that is objectionable. In the context of this case it would perhaps be suitable to say that the attempt to derive information about the altitude, speed, heading, and vertical acceleration of Flight 383 was a factual inquiry. However, a very sophisticated evaluation of

the data had to be made. Because of the uncertainty which the *Frank* rule would introduce in sorting fact from opinion, it would be better to exclude opinion testimony only when it embraces the probable cause of the accident or the negligence of the defendant.

■■■■ On two occasions evidence of precautions taken by the defendant since the accident were admitted. Of course, the general rule is that such evidence is not admissible to prove antecedent negligence. However, use of such evidence for rebuttal or impeachment is permitted, Tyler v. Dowell, Inc., 10 Cir., 1960, 274 F.2d 890, cert. denied 363 U.S. 812, 80 S.Ct. 1248, 4 L.Ed.2d 1153 (1960).

■■■■ Here plaintiff was allowed to prove that the face of the drum type altimeter used aboard American's 727's had been altered since the accident. Such proof was admitted only after Captain Gibson, American's Director of Flight Operations, had testified that the instrument was entirely feasible and safe and that there was no reason to change it. The subsequent admission that the cross checks on the face of the altimeter were changed so that they indicated altitude below zero was properly admissible for impeachment within the *Tyler* rule.

■■■■ Likewise the evidence of crew changes since the accident came up in a similar context. Captain Gibson was asked whether it was feasible to allow a regular co-pilot to occupy the right seat when a twenty-five hour qualification check was being made on the pilot in the left seat. In the circumstances of this case Captain Gibson testified that it was not feasible to do so. Then the following colloquy took place

"Q. Captain, isn't it true that since this accident you changed *that very procedure* [letting the captain occupy the co-pilots seat] and now do it differently?

[Objection]

"A. Yes, we require that a full crew be required on the airplane, that

is, the first officer will now occupy the observors seat on a transition training flight * *."

The information that American now uses an additional man in the cockpit was plainly not requested. Clearly the unresponsive answer should not provide grounds for a reversal.

Plaintiff was permitted to introduce evidence that Captain O'Neill, who was flying the plane at the time of the crash, had failed to execute the missed approach procedure to the satisfaction of the examiner. The challenge to this testimony is grounded upon the rule that evidence of a similar act of negligence is not admissible to prove negligence in performing the same act later. Missouri, K & T Ry. Co. v. Johnson, 92 Texas 380, 48 S.W. 568 (1898); United States v. Compania Cubana De Aviacion, S.A., 5 Cir., 1955, 224 F.2d 811, 820.

Although prior negligence as establishing an inclination toward lack of due care is not admissible, plaintiff presented the evidence in support of another theory. Specifically, plaintiff was seeking to show the negligence of American Airlines in allowing Captain O'Neill to land the plane in less than ideal whether. There is ample support for allowing recovery for negligence in allowing insufficiently trained pilots to take over. Evans v. United States, 100 F.Supp. 5, 8 (W.D.La., 1951); Stiles v. National Airlines, Inc., 161 F.Supp. 125 (E.D.La., 1953), affirmed appeal on damages only, 5 Cir., 1959, 268 F.2d 400; Montellier v. United States, 202 F.Supp. 384 (E.D.N.Y., 1962), affirmed without discussion of this point, 2 Cir., 1963, 315 F.2d 180.

Furthermore, Captain O'Neill's difficulty with his missed approach procedure bore on Captain Teelin's decision to allow Captain O'Neill to take over on a visual approach at night in marginal weather. American Airlines Flight Manual expressly stated, "Captains are expected to exercise good judgment and evaluate the First Officers recent experience and his own experience level as well as due consideration to all other conditions including wind, runway lanes, runway conditions and so forth".

Reversal is also requested on the ground that two jurors withheld information during voir dire when the court inquired about previous automobile accidents. In denying a motion for a new trial based on the jurors' conduct the court found that American was not prejudiced by any of the jurors and that the defendant knew and could have known the grounds for a new trial before verdict.

The trial court, in a post trial hearing, took testimony and fully investigated American's contentions on this issue. Upon reading the record in the light of applicable law we find no reversible error with reference to this aspect of the trial.

The Judgment of the District Court is, in all respects

Affirmed.

## ON PETITION FOR REHEARING

PER CURIAM:

Upon consideration of the petition for rehearing in this case, it is ordered that Paragraph number 4 on page 193 of 418 F.2d be modified to read as follows:

"4. The air traffic controller, whether or not required by the manuals, must warn of dangers reasonably apparent to him."

We disagree with the contentions of appellant, American Airlines, that such a modification alters the rationale or dictates a different result to that reached in our original opinion.

The petition for rehearing is

Denied.