**In re EUFAULA ENTERPRISES, INC., a corporation, debtor.**

**WELLSTON, OKLAHOMA, NATURAL GAS AUTHORITY BONDHOLDERS, Intervenor, Appellant,**

v.

**Charles R. NESBITT, Trustee, Appellee.**

**No. 77–1104.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted July 18, 1977.

Decided Nov. 21, 1977.

Robert G. Grove, Oklahoma City, Okl., for appellant.

Robert N. Naifeh, Norman, Okl., for appellee.

Before McWILLIAMS and DOYLE, Circuit Judges, and MARKEY,* Chief Judge.

MARKEY, Chief Judge.

Appeal from a February 2, 1977 district court order sustaining a bankruptcy refer-

---

* Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

ee's requirement that a state-appointed receiver of the Wellston, Oklahoma, Natural Gas Authority (NGA) turn over NGA's assets to the trustee of Eufaula Enterprises, Inc. (Eufala), the bankrupt debtor. Appellants (bondholders) are intervenors in the bankruptcy proceeding. We affirm.

### Background

Though the issue is uncomplicated, a clear understanding of its resolution requires an extended narration of the facts.

The Wellston, Oklahoma, Industrial Facilities Authority (IFA) was created by a declaration of trust on August 3, 1971. On the same day, the Town of Wellston passed an ordinance accepting the beneficial interest therein.

On September 10, 1971, the board of IFA passed a resolution authorizing issuance of $3,585,000 in industrial revenue bonds to finance an industrial development "Project" (real property, equipment, and buildings). The bonds were to be delivered, in exchange for the purchase price, to Perry, Adams & Lewis, Inc. (PAL), a Kansas City, Missouri, brokerage firm.

The resolution authorized an agreement between IFA and Oklahoma Energy, Inc. (OEI), whereby OEI was to lease and operate the Project from September 1, 1971 to August 31, 1983. Rent was to be paid to the First National Bank and Trust Company of Oklahoma City, Oklahoma, for IFA's account, and applied to principal and interest on the bonds.

On October 11, 1971 IFA's name was changed to NGA, a second bond issue was authorized to reflect the new name, and previous acts and documents of IFA were ratified.[1]

On October 14, 1971, Guy Swadley, Jr., chairman of NGA, acknowledged receipt from PAL of $3,585,000. (That acknowledgement was false).

On November 15, 1971 NGA and OEI cancelled the IFA–OEI contract by mutual consent.[2]

On September 1, 1975, NGA defaulted on its bond obligation. John I. Willhauck, president and sole stockholder of Eufaula, was notified by bondholder's counsel on December 8, 1975 that legal action was intended unless payment was made on the defaulted bonds.

On December 9, 1975, Eufaula began transferring property held in its name to NGA.

On December 23, 1975, Gary J. Eidson, mayor of Wellston and ex officio member of the board of NGA filed a petition in state court for appointment of a receiver for NGA. A receiver was appointed on December 29, 1975. The state court ordered Eufaula to transfer to NGA all assets acquired with proceeds from the bond sales and all contracts involving the Project. The transfers were made on January 6, and January 8, 1976.

On April 21, 1976, creditors of Eufaula filed an involuntary petition under Chapter X of the Bankruptcy Act, 11 U.S.C. §§ 501–676, against Eufaula and NGA. The bondholders' motion to intervene was granted on May 25, 1976. Eufaula was declared bankrupt on June 24, 1976, and a trustee was appointed. On July 6, 1976, a turnover petition was filed, alleging that NGA was a sham and the alter ego of Eufaula, and requesting that NGA be ordered to surrender its assets to the trustee for Eufaula.

At the hearing on the turnover petition, Willhauck said Eufaula was organized in the late 1960's as a wholly owned subsidiary of PAL, with whom it shared offices. Willhauck was at that time an underwriter for PAL and vice-president of Eufaula.

---

1. The resolution stated that the change was made "to more accurately define [the public trust's] function and purpose." The previous bond issue was to be recalled and destroyed. The Town of Wellston consented to the name change and accepted the beneficial interest in NGA.

2. The events thus far related appear in the transcript of NGA's proceedings, which appear to have conformed with Oklahoma's public trust laws, Okl.Stat. tit. 60, §§ 176–180.

Kenneth W. Lackey, an Eufaula, Oklahoma, attorney, testified that he was involved in the organization of Eufaula as a land development company, dealing in real estate, installation of water and sewer systems, and construction of streets, for which the Eufaula Utility Authority (EUA) had issued bonds through PAL. Eufaula succeeded the bankrupt Keystone Industries as operating agent for EUA.

Lackey also said that in 1971 Willhauck proposed forming a public authority for converting natural gas into electricity, and that he assisted Willhauck by "looking all over Oklahoma * * * to find a supply of gas" (the Wellston area was eventually chosen) and enlisting several friends as trustees, after having been assured that they would serve "in name only." These same friends were already serving as trustees of EUA.

Willhauck met with the Wellston, Oklahoma, city council and made his proposal, which the council approved. As an apparent incentive, Willhauck told the council that if the venture were successful Wellston would receive $2,000 per month "as consideration of their accepting the beneficial interest of the authority and cooperating in the program."

The NGA trustees met periodically in Lackey's office during the fall of 1971 and took the official actions required to issue the bonds. The trustees never again met. Three resigned in late 1972 and were never replaced.[3] The bondholders were never told of the resignations.

It was originally contemplated that NGA would purchase natural gas with which it would generate electricity to sell to local utilities. To this end feasibility studies were performed and plans were made for the construction of a gas turbine electric generating station. The plans were scrapped, according to Willhauck, because government priorities had just been established for the use of natural gas, and electric turbine generation was "close to the bottom."

A decision was then made to sell natural gas wholesale, however, the details of this new undertaking were not fully formulated. Thus, $3,585,000 in bonds were sold notwithstanding that the location of the activity had not yet been determined.

The record indicates that cancellation of the OEI operating contract resulted from its disapproval by the bond rating agency. Willhauck's testimony on this point[4] was contradicted by Lackey, who said the rating agency required a company with a "track record," and OEI failed to qualify, having just been created on July 9, 1971.

The officers and incorporators of OEI were Willhauck, Perry, Adams, and Lewis. OEI's charter was subsequently suspended for non-payment of its corporate franchise tax.

After cancellation of the OEI contract, no operating agreement was made with another party. PAL used the proceeds from its sale of the bonds to acquire, in its own name, a natural gas gathering system and a processing plant (the Wellston facility).[5] Willhauck negotiated the purchase of the Wellston facility from Texaco, and fragments of gas gathering systems were purchased from others. NGA received no title to land, plant machinery, or other asset before December, 1975.[6]

In response to pending changes in Securities & Exchange Commission rules, which, said Willhauck, "tended to limit future operations of brokerage houses to brokerage,

---

3. Voting rights had been exercised by the three who resigned. The fourth member of the board, the mayor of Wellston, had no voting rights.

4. According to Willhauck, the rating agency "would not rate * * * an industrial revenue bond * * * it would have to be a pure

gas revenue bond * * * payable purely from gas revenues generated by the facility."

5. The bondholders say that PAL was performing OEI's duties under the contract.

6. The only exception was a single tract purchased as an alternate plant site for the electric generating station, but never used.

period," PAL divested itself of Eufaula in 1973. Willhauck surrendered his partnership in PAL and became sole stockholder of Eufaula. About that time, the Wellston facility was conveyed from PAL to Eufaula.

Eufaula commingled in a single account the proceeds from bond sales,[7] operating revenues of the Wellston facility and other oil and gas projects financed through municipal bond issues, and proceeds from real estate sales. At no time did NGA ever actually receive any money. The trustees were not even aware that the bonds had been sold.

By December 1975, Eufaula was on the verge of collapse. Gas revenues had been received but suppliers at the wellhead had not been paid. In late December, Willhauck, Eidson, and James C. Russell, plant manager of the Wellston facility, decided to put NGA into receivership, and Eidson filed the December 23, 1975 petition for appointment of a receiver.

Russell, the receiver for NGA, recalled that he had testified during the earlier proceeding that he paid no claims against Eufaula arising prior to December 29, 1975, his position being that NGA was not responsible for debts incurred by Eufaula.

On the basis of the foregoing evidence and testimony, the referee found, inter alia, that:[8]

1. NGA was a sham, and an instrumentality or alter ego of Eufaula.

2. NGA had no independent existence, held no meetings, conducted no business, and exercised no ownership or control over property.

3. No bond purchasers thought they were dealing with NGA, or relied on its existence in any way.

4. Property transferred after the receivership proceeding was beyond the reach of some Eufaula creditors.

5. Justice demands a disregard of the form of separate legal entities and ownership of NGA must be adjudged ownership of Eufaula.

6. Property transfers from Eufaula to NGA were void.

7. All property presently in the name of NGA is property of Eufaula.

8. Any claim of NGA to title or ownership of property is insubstantial and colorable.

Accordingly, an order was entered on July 30, 1976 granting the turnover petition.

The bondholders appealed to the district court which adopted the findings and sustained the order of the referee.

*Issue*

The dispositive issue is whether the finding that NGA was an instrumentality or alter ego of Eufaula is clearly erroneous, for if not, the referee in bankruptcy properly exercised summary jurisdiction in requiring the state-appointed receiver to turn over NGA's assets to the trustee of Eufaula.

OPINION

Findings made by a referee in bankruptcy and adopted by the district court will not be set aside on appeal unless clearly erroneous. *McConnell v. Estate of Butler*, 402 F.2d 362 (9th Cir. 1968). Due regard must be given to the opportunity of the referee to judge the credibility of the witnesses.[9] Thus, an appellate court will not weigh evidence "de novo," *Dailey v. City of Lawton*, 425 F.2d 1037 (10th Cir. 1970), but will view it in the light most favorable to the party prevailing below. *Aunt Mid, Inc. v.*

---

7. Prior to the divestiture, bond proceeds were placed in PAL's inter-company account and credited to its subsidiary, Eufaula. Willhauck said that Eufaula's records had not been audited for ten to twelve years.

8. We have renumbered and paraphrased the referee's findings, listing only those specifically questioned by the bondholders.

9. Rules of Bankruptcy Procedure 810, as the Advisory Committee's Note states, gives the same effect to a referee's findings as Fed.R. Civ.P. 52(a) accords findings of the trial court.

*Fjell-Oranje Lines,* 458 F.2d 712 (7th Cir.), *cert. denied,* 409 U.S. 877, 93 S.Ct. 130, 34 L.Ed.2d 131 (1972).

These rules apply to determinations of whether one legal entity is the instrumentality or alter ego of another. *National Bond Finance Co. v. General Motors Corp.,* 341 F.2d 1022 (8th Cir. 1965).

■ When one legal entity is but an instrumentality or alter ego of another, by which it is dominated, a court may look beyond form to substance and may disregard the theory of distinct legal entities in determining ownership of assets in a bankruptcy proceeding. *Forbush Co. v. Bartley,* 78 F.2d 805 (10th Cir. 1935).

■ The record here establishes that NGA was employed as a device to obtain operating capital for Eufaula's business ventures, and that, after the bonds were issued, Eufaula had no further use for NGA, which then became dormant, Eufaula proceeding to use the money and operate the Wellston facility as if it were the sole owner.

The bondholders' primary argument is that NGA was validly organized in accordance with the Oklahoma public trust law and that the referee was not therefore at liberty to find it a mere instrumentality or alter ego of another.[10]

The key word in the referee's finding that NGA had no independent existence is "independent." Willhauck, acting in Eufaula's behalf, was the moving force behind the organization of NGA and its issuance of the bonds, after which NGA effectively ceased to function as a public trust. Of course, the appearance of proper organization had to be created to insure salability of the bonds. But all of the events following the bond sale evidence that NGA was merely the instrumentality or alter ego of Eufaula.

The bondholders attack the referee's findings as being based on testimony of the trustee, whose conclusion that NGA was a sham was admittedly drawn from discussions with Willhauck and Lackey. The bondholders emphasize Willhauck's testimony that the Wellston facility was purchased in PAL's name as "contractor" to facilitate the transaction, and that neither PAL nor Eufaula ever made a claim to the property. Whatever may be the effect of that testimony considered alone, it cannot render the findings erroneous when considered in the context of the entire record. In this regard, we note that the referee, in evaluating Willhauck's testimony, was confronted with inconsistencies and specific contradictions. For example, there was admitted into evidence a statement filed by Willhauck in the receivership proceeding that listed the purchase price of NGA's tract of land as $30,000 when the revenue stamps showed $20,000; Willhauck said the Wellston facility wasn't carried as an asset by Eufaula, but when it was transferred to NGA, Eufaula's accountant wrote off $1,200,000, indicating the contrary; Willhauck said compressors were purchased with bond proceeds, but, when questioned about Eufaula's sale of the compressors, he said the proceeds from that sale were credited to Eufaula because the compressors had been purchased with Eufaula's money.

Though mindful of the bondholders' status as apparent victims of the actions reflected in the record, we cannot overlook the fraud which would be worked upon Eufaula's creditors if the fiction of separate legal entities were permitted to stand in this case. Cf. *In re Muncie Pulp Co.,* 139 F. 546 (2nd Cir.), *cert. denied,* 202 U.S. 621, 26 S.Ct. 766, 50 L.Ed. 1175 (1905). The bondholders are not, however, totally without remedy. As pointed out by the referee, their interests will be fairly treated in the Chapter X proceedings.

Finally, the bondholders urge that a public trust does not occupy "the same posture before the court as does a privately or publicly held corporation." Presumably, the intended inference is that a public trust is somehow sacrosanct, and not subject to

---

**10.** The bondholders also argue that NGA is the equitable owner of the involved property, but that argument pre-supposes that NGA is a separate legal entity.

**1162**

"veil piercing" in the same manner as are corporations in general. However, a bankruptcy court, as a court of equity, has not merely the power but the duty to disregard the fiction of separate legal entities when the ends of justice so require, even though one of the entities was ostensibly formed in the public interest. *Macfadden v. Macfadden*, 46 N.J.Super. 242, 134 A.2d 531 (Ch. 1957), *aff'd.*, 49 N.J.Super. 356, 139 A.2d 774 (App.Div.1958), *cert. denied*, 27 N.J. 155, 141 A.2d 828 (1958).

The order of the district court is affirmed.